Case 4:93-cv-03651  Document 1  Filed in TXSD on 11/16/93  Page 1 of 106

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States District Court
Southern District of Texas
FILED

NOV 16 1993

Michael N. Milby, Clerk

| | | |
|---|---|---|
| HOUSTON CONTRACTORS | § | |
| ASSOCIATION, | § | |
| Plaintiff | § | **H 93 3651** |
| | § | |
| v. | § | CIVIL ACTION NO. _____ |
| | § | |
| METROPOLITAN TRANSIT AUTHORITY | § | |
| OF HARRIS COUNTY, | § | |
| Defendant | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

HOUSTON CONTRACTORS ASSOCIATION ("HCA"), plaintiff, files this "Plaintiff's Original Complaint," and in support thereof, respectfully shows as follows:

I.

### PARTIES

1.01  Plaintiff HCA is an incorporated entity which represents prime contractors and sub-contractors, as well as construction-related suppliers and service providers in the Houston metropolitan area.  HCA has its principal office in Houston, Harris County, Texas.

1.02  Defendant Metropolitan Transit Authority of Harris County, Texas ("Metro") is a governmental entity which serves Harris County and its metropolitan counties.  Metro has its administrative office in Houston, Harris County, Texas.  Metro can be served through its chief executive officer and General Manager Robert G. MacLennan at 1201 Louisiana, Houston, Texas, 77002.

CVirPDF - www.fastio.com

II.

## JURISDICTION AND VENUE

### A.

### Jurisdiction

2.01    This Court has jurisdiction over HCA's claims against Metro pursuant to 28 U.S.C. §§ 1331 and 1343.

### B.

### Venue

2.02    This Court has venue over HCA's claims against Metro as the claims made the basis of HCA's lawsuit arose in Harris County, Texas and its surrounding metropolitan counties.  In addition, Metro's administrative office is located in Houston.   Houston, Harris County and the surrounding metropolitan counties are located within the United States District for the Southern District of Texas.   28 U.S.C. § 1391(b).

III.

## FACTS

3.01    Metro has implemented an affirmative action program which applies to all contracts in excess of $10,000 funded in whole or in part with local funds or by federal grants, except those involving transit vehicle manufacturers and suppliers under an Urban Mass Transportation program.  The U.S. Supreme Court held in *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989) that governmental minority affirmative action programs which deny certain citizens the opportunity to compete for fixed percentages of public contracts based solely on their race are subject to a

-2-

strict scrutiny standard of review, and require a firm evidentiary basis for concluding that underrepresentation of minorities in a particular industry is a product of past discrimination. Further, the Court ruled that plans adopted to remedy any identified underrepresentation of minorities in a particular industry which is the product of past discrimination must be narrowly tailored to remedy the effects of such past discrimination. (*Id.*, at 507 to 508.)

3.02  In or about March 1990, Metro submitted its current "Disadvantaged Business Enterprise Program" ("Program") to the Urban Mass Transportation Administration. A copy of the Program is attached as Exhibit "A" and is incorporated by reference for all purposes.

3.03  Under the Program Bidders on Metro contracts must meet or exceed the Program's overall goal of 21% participation by DBEs, or demonstrate that such goals cannot be met despite their best efforts. In addition, the Metro "staff sets project - specific DBE utilization goals, which may exceed 21%, depending on availability of DBE's capable of performing the specified scope of work." (Exhibit A, page 4.) Further, if a contractor cannot meet Metro's DBE goals using DBE's from the Houston geographic area, the contractor "is expected to expand its search to a wider geographic area." (Exhibit A, page 12.)

3.04  In calculating the amount of DBE participation in its programs, Metro provides for the following:

-3-

a.  Only those expenditures which are deemed to serve a "commercially useful function" may count against the 21% goal;

b.  Only 60% of a contractor's expenditures for materials and supplies obtained from a DBE regular dealer may be counted towards the 21% goal; and

c.  Only in the event that a DBE assumes certain required responsibilities will 100% of the expenditures to a manufacturer be applied to the 21% goal.

3.05  Under the Program, a "disadvantaged business" is defined as a small business concern which is controlled and owned by socially and economically disadvantaged individuals.  A small business concern is defined as one which is at least 51% owned by socially and economically disadvantaged individuals and whose daily operations are controlled by one of its socially and economically disadvantaged owners.  Metro establishes a presumption that the following groups are socially and economically disadvantaged: a) Black Americans; b) Hispanic Americans; c) Native Americans; d) Asian Pacific Americans; e) Asian Indian Americans; f) Women; and g) Other minorities.  (See, Exhibit A; "Definitions," which is set out as Section III of the Metro Program.)  The primary focus of Metro's analysis of whether an entity constitutes a DBE is the social status of the entity's owners/controllers.  In the event that an entity fails to meet the social prong of Metro's two prong DBE test, Metro never reaches the second prong of economic disadvantage.  (See, Exhibit A; "Guidance for Making Determination For Social and Economic Disadvantage;" which is set out as Section

-4-

VI(E) to the Metro Program.) Further, not every member within a group qualifies as a DBE.

3.06 In order to qualify as a DBE, an individual must show that the individual suffered social disadvantage. The individual cannot merely claim membership in a group which claims to be socially disadvantaged. In reviewing a potential DBE's application for DBE certification, Metro will look to whether the individual has suffered social disadvantage in the following: a) education; b) employment; and c) business history.

3.07 Metro also initiated a "Set-Aside" Program in conjunction with its Metro Program. Under this program, Metro will limit consideration of bids or proposals to those submitted by DBEs. By this method, Metro has assured that a non-DBE will never have an opportunity to receive certain contracts. (See, Exhibit A; "Set-Aside Program," which is set out as Section X to the Metro Program.)

3.8 A representative of Metro has admitted that Metro failed to conduct a pre-enactment investigation as to whether, or to what extent, the groups set out in above paragraph 3.05 have experienced social or economic disadvantage in procuring Metro contracts.

3.9 HCA is an incorporated entity which represents the interests of prime and sub-contractors, as well as construction-related suppliers, service providers, distributors, and labor within the metropolitan Houston, Harris County, Texas area.

3.10 Since the inception of Metro's Program, HCA members have lost contracts which they might otherwise have won or have had to

-5-

pay higher sums to Disadvantaged Business Enterprises ("DBEs") protected under the Program than the members would have had to pay to non-DBEs as a result of Metro's Program.

IV.

## CAUSES OF ACTION

4.01  For purposes of this Section IV, HCA incorporates above paragraphs 3.01 through 3.10.

4.02  42 U.S.C. § 1981 provides that: a) every person; b) within the jurisdiction of the United States; c) shall have the same right to make contracts; and d) shall enjoy full and equal benefits of all laws.

4.03  42 U.S.C. § 1983 provides that: a) every person; b) who, under color of any statute, regulation, or custom; c) of any State; d) subjects another person within the jurisdiction of the United States; e) to any deprivation of any rights or privileges secured by the Constitution; f) shall be liable to the injured party.

4.04  Metro analyzes qualified participation in its Program by reference to race and gender.  Thus, Metro is reserving or setting aside certain contracts, or portions thereof, to the exclusion of HCA members which are not of such race or gender.  The participation goal is an arbitrary figure and is not based on a compelling government interest since there is no proper factual predicate for the plan.  Upon information provided to HCA, Metro failed to conduct a thorough analysis of the level of disadvantage, if any, experienced by putative DBEs.  HCA is unaware of any studies by Metro into any past discrimination which address any of

-6-

Case 4:93-cv-03651 Document 1 Filed in TXSD on 11/16/93 Page 7 of 106

the following factors: a) the number of contractors within Metro's
jurisdiction; b) the number of minority or women contractors within
Metro's jurisdiction; c) the number of contractors within specific
construction fields (i.e., plumbing, road, paving, sewer); d) the
number of minority and women contractors within such specific
fields, e) the number of manufacturers, suppliers, or distributors
within Metro's jurisdiction; f) the number of minority and women
manufacturers, suppliers, or distributors of construction-related
products; g) the total dollar amount of construction-related
contracts let by Metro; h) the total dollar amount of construction-
related contracts let to minority or women contractors, by field of
concentration, manufacturers, suppliers, or distributors; i) the
history of past disadvantage, if any, experienced by minority or
women contractors; j) whether such disadvantage, if any, was the
result of racial or gender based circumstances; and k) any
correlation between the 21% goal set by Metro and the history of
disadvantage, if any, experienced by minority or women contractors.

4.05 Metro failed to identify the cause of underpresentation,
if any, of minorities in the Houston construction industry.
Nonetheless, the Metro program denies non-minority and male
contractors the equal opportunity to compete for Metro contracts
based solely on their race and sex. The U.S. Supreme Court in *City
of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989) has ruled that
a governmental entity which fails to identify the need for remedial
action in awarding its public construction contracts violates the

-7-

Equal Protection Clause by treating its citizens differently on a racial basis. (*Id.*, at 512.)

4.06    Despite its stated purpose of achieving 21% participation by DBEs, in certain circumstances the Program actually requires a higher and indeterminate level of DBE participation.   Under the Program, an expenditure made to an otherwise disadvantaged business concern does not qualify against the 21% goal unless the business either has been certified by Metro or has provided services or goods which Metro deems to serve a "commercially useful function."     Further, only 60% of a contractor's expenditures for materials or supplies from a DBE dealer qualify against the 21% goal. A contractor, attempting to qualify under the Program by purchasing goods or services from a DBE dealer, would actually have to expend 35% of his contract budget in order to meet the participation goals set out in the Program.

4.07    Despite its stated purpose of assisting disadvantaged businesses, Metro's Program only applies to those businesses which qualify for certification under the Program.     These exists no mechanism under the Program for application of expenditures toward the 21% goal made to non-certified disadvantaged businesses. Upon information made available to HCA, there exist businesses within the Houston, Harris County, Texas metropolitan area which, but for the certification, would qualify as a DBE.    Further, because the minority goals must be met even with DBE's outside the Houston

-8-

area, the class of persons benefitted by the program are not those that would have been victims of local discrimination, if any.

4.08 The Program sets out five (5) racial classes, one (1) gender class, and a catch-all class for inclusion into the 21% participation goal. Upon information made available to HCA, Metro has not conducted any study analysis to determine the extent to which, if any, each of such classes have been disadvantaged.

4.09 For purposes of certification, the Program sets forth education, employment, and business history as the three (3) factors by which Metro will determine whether a DBE has experienced disadvantage. Two of these factors, education and employment, are irrelevant to the issue of whether a prospective DBE has been denied an opportunity to bid on Metro contracts.

4.10 Metro also established a "Set-Aside" Program whereby certain Metro contracts will be set aside for DBE participation. Metro's stated goal is to limit consideration of these contracts to DBEs, to the exclusion of HCA members.

V.

## DAMAGES AND ATTORNEY'S FEES

5.01 Based upon the foregoing, HCA and its members have suffered injury as the direct result of Metro's Program. Some members have lost contracts as the result of having to factor in the higher costs of using Metro certified DBEs. Other members have lost profits which they otherwise could have retained but for having to pay higher expenditures to DBEs.

5.02 HCA seeks recovery of attorney's fees pursuant to 42 U.S.C. § 1988.

## VI.

### JURY DEMAND

In accordance with 28 U.S.C. Rule 38, HCA requests a jury trial in this matter.

**WHEREFORE, PREMISES CONSIDERED,** the Houston Contractors Association respectfully requests that, upon trial, this Court strike down Metro's Program on the basis that the Program violates the 13th and 14th Amendments of the United States Constitution, as provided for in 42 U.S.C. §§ 1981 and 1983; that this Court award to Houston Contractors Association, on behalf of its members, damages and attorney's fees; and that the Court grant to Houston Contractors Association all further relief at law or in equity to which Houston Contractors Association may be entitled.

Respectfully submitted,

URQUHART & HASSELL

By: _____
SILVIA T. HASSELL
Texas Bar No. 09205200
Admissions I.D. No. 2414
2727 Allen Parkway,
Suite 1600
Houston, Texas   77019
(713) 524-4499 Telephone
(713) 524-7394 Telefacsimile

ATTORNEY IN CHARGE FOR PLAINTIFF,
HOUSTON CONTRACTORS ASSOCIATION

OF COUNSEL:

URQUHART & HASSELL

-10-

CVisPDF - www.fasoo.com

# METRO ®

# Disadvantaged Business Enterprise Program (Pursuant to 49 CFR Part 23)

Submitted to the Urban
Mass Transportation
Administration
U.S. Department of
Transportation
March 1990

EXHIBIT "A"

## DISADVANTAGED BUSINESS ENTERPRISE PROGRAM
## METROPOLITAN TRANSIT AUTHORITY OF HARRIS COUNTY

Submitted to the Urban
Mass Transportation
Administration
U.S. Department
March 1990

CVUPDF - www.fastio.com

Case 4:93-cv-03651   Document 1   Filed in TXSD on 11/16/93   Page 14 of 106

TABLE OF CONTENTS

PAGE

I.   Disadvantaged Business Enterprise (DBE) Policy          1

II.  DBE Program Overview                                    2

III. Definitions                                             3

IV.  DBE Program Organization                                5

V.   DBE Program Goals                                       12

     A. Procurements Other Than Transit Vehicles            12
     B. DBE Requirements for Transit Vehicle Manufacturers  15
     C. Policy Concerning Leases                             16
     D. Opportunities for Banks Owned and Controlled by
        Socially and Economically Disadvantaged Individuals 17

VI.  DBE Certification Procedures                            18

     A. Determination of Small Business Status              19
     B. Determination of Ownership and Control              22
     C. Information to Assist in Determining Legitimacy
        of DBEs                                              25
     D. Information to Assist in Determining Legitimacy
        of Joint Ventures                                    27
     E. Guidance for Making Determination for Social and
        Economic Disadvantage                               28

VII. Procedures to Ensure That DBEs Have an Equitable
     Opportunity to Compete for Contracts and Subcontracts  32

     A. A Description of the Methods by Which METRO Will
        Require Sub-recipients, Contractors, and
        Sub-contractors to Comply With Applicable DBE
        Requirements                                        36
     B. Means to Ensure that Competitors Make Good Faith
        Efforts to Meet DBE Contract Goals                  38
     C. Procedures to Require That Participating DBEs are
        Identified by Name of Competitors for Contracts     40

VIII. Maintenance of Records and Reports                    41

IX.  DBE Directory                                           43

Case 4:93-cv-03651 Document 1 Filed in TXSD on 11/16/93 Page 15 of 106

**Table of Contents (Cont'd)**

| | | PAGE |
|---|---|---|
| X. | "Set-Aside" Program | 44 |
| XI. | Exhibits | 45 |
| | 1. Organization Chart - Executive Office | 46 |
| | 2. Organization Chart - Affirmative Action Office | 47 |
| | 3. Appeals of Denial of Certification as a DBE | 48 |
| | 4. Challenge Procedure | 50 |

CHdPDF - www.fastio.com

Case 4:93-cv-03651  Document 1  Filed in TXSD on 11/16/93  Page 16 of 106

I.

## DISADVANTAGED BUSINESS ENTERPRISE
## (DBE) POLICY

The Disadvantaged Business Enterprise (DBE) Program of the Metropolitan Transit Authority (METRO) has been developed in accordance with the requirements of the Department of Transportation's (DOT) regulations pursuant to 49 CFR Part 23.

METRO's DBE Program applies to all contracts in excess of $10,000, funded in whole or in part with local funds or by Federal grants, except those involving transit vehicle manufacturers and suppliers who are required to have an Urban Mass Transportation Administration (UMTA) approved DBE Program, as outlined on Page 15 of this document.

METRO's DBE Program will not be used to discriminate against any company or groups of companies. However, METRO accepts the premise that special efforts must be made to include small disadvantaged businesses owned and controlled by socially and economically disadvantaged individuals in the nation's economic system and METRO is committed to ensuring disadvantaged firms an equitable opportunity by undertaking every reasonable effort to attain the goals set forth in this DBE Program.

Case 4:93-cv-03651 Document 1 Filed in TXSD on 11/16/93 Page 17 of 106

## II.

### DBE PROGRAM OVERVIEW

METRO will take affirmative action to ensure that Disadvantaged Business Enterprises have the maximum opportunity to participate in procurement and contracting opportunities financed in whole or in part with funds which are local or derived from the Urban Mass Transportation Administration.

In connection with the performance of this program, METRO will provide for the maximum utilization of small businesses owned and controlled by socially and economically disadvantaged individuals and will use its best efforts to ensure that they are afforded an opportunity to compete for contract and subcontract work let by METRO.

## III.

## DEFINITIONS

"Disadvantaged Business" means a small business concern owned and controlled by socially and economically disadvantaged individuals.

"Socially and economically disadvantaged small business concern" means any small business concern:

1. which is at least 51 percent owned by one or more socially and economically disadvantaged individuals; or, in the case of any publicly owned business, at least 51 percent of the stock of which is owned by one or more socially and economically disadvantaged individuals; and

2. whose management and daily business operations are controlled by one or more of the socially and economically disadvantaged individuals who own it.

METRO makes a rebuttable presumption that individuals in the following groups are socially and economically disadvantaged and reserves the right to determine, on a case-by-case basis, that individuals who are not members of one of the following groups are socially and economically disadvantaged:

1. "Black Americans," which includes persons having origins in any of the Black racial groups of Africa;

2. "Hispanic Americans," which includes persons of Mexican, Puerto Rican, Cuban, Central or South American, or other Spanish or Portuguese culture or origin, regardless of race;

3. "Native Americans," which includes persons who are American Indians, Eskimos, Aleuts, or Native Hawaiians;

4. "Asian-Pacific Americans," which includes persons whose origins are from Japan, China, Taiwan, Korea, Vietnam, Laos, Cambodia, the Philippines, Samoa, Guam, the U.S. Trust Territories of the Pacific, and the Northern Marianas;

5. "Asian-Indian Americans," which includes persons whose origins are from India, Pakistan, and Bangladesh;

6. Women;

7.    and any other minorities or individuals found to be
      disadvantaged by the Small Business Administration pursuant
      to Section 8(a) of the Small Business Act.

Only citizens of the United States (or lawfully admitted permanent
residents) are eligible to qualify as socially and economically
disadvantaged individuals.

"Small business concern" means a small business as defined pursuant
to Section 3 of the Small Business Act and relevant regulations
promulgated pursuant thereto except that a small business concern
shall not include any concern or group of concerns controlled by the
same socially and economically disadvantaged individual or
individuals which has annual average gross receipts in excess of
$14 million over the previous three fiscal years.

The Assistant to the General Manager for Affirmative Action (AGM) is
primarily responsible for the development and enforcement of the DBE
Program consistent with METRO policy and Department of Transportation
regulations. The daily activities of the DBE program will be carried
out by the DBE staff in cooperation with those METRO staff
responsible for activities involving procurement, consultant
selection, bid preparation and contract compliance.

Objectives of the program include achieving the goal of expending 21%
of METRO's contractual dollars with small businesses owned and
controlled by socially and economically disadvantaged individuals.
In addition, the staff sets project-specific DBE utilization goals,
which may exceed 21%, depending on availability of DBEs capable of
performing the specified scope of work.

The DBE policies and procedures developed by METRO are achieving
their objectives and are consistent with the provisions of 49 CFR
Part 23, as amended. METRO does not discriminate on the basis of
race, color, national origin, or sex in the award and performance of
any of its contracts. The DBE policy is disseminated throughout
METRO's organization. Economic development agencies and organiza-
tions, contractor associations, the media, women's business
associations and non-minority business and community organizations
are included in the circulation of METRO's DBE Policy.

IV.

## DBE PROGRAM ORGANIZATION

Overall authority and responsibility for daily implementation of
METRO's DBE Program is vested in the Assistant to the General Manager
for Affirmative Action (AGM).  Direct responsibility for developing,
directing, and implementing METRO's DBE Program rests with the
Disadvantaged Business Enterprise Officer and DBE staff.  All METRO
management staff share responsibility for ensuring the effective
implementation of the DBE Program.  As appropriate, management staff
will be evaluated on their performance in this area.  The following
describes the primary tasks assigned to METRO employees for the
implementation of the DBE Program.

### A.   AGM FOR AFFIRMATIVE ACTION

#### 1.   Summary of Responsibilities

The AGM is responsible for coordinating, supervising, and
administering the activities of the Affirmative Action
Office in the following areas:  Disadvantaged Business
Enterprise Programs, Equal Employment Opportunity Programs,
Contract Compliance, Title VI, Davis Bacon and Copeland
Acts.

#### 2.   Reporting Relationship

The AGM reports directly to the General Manager.

#### 3.   Principal Duties

The AGM:

o   Develops,  implements,  and  evaluates  METRO's
     Affirmative  Action  Plan.  In  developing  the
     Affirmative Action Plan, the AGM coordinates with
     other METRO staff members as appropriate.

o   Provides assistance to departments and divisions in
     resolving specific problems related to implementation
     of METRO's Affirmative Action Plan and achievement of
     stated goals and timetables.

o   Advises the General Manager, legal counsel, and other
     appropriate  personnel  of  the  most  recent  laws,
     regulations, and guidelines as they affect METRO's
     affirmative action policies and programs.

o   Maintains liaison with appropriate enforcement
    agencies at the Federal and State levels.

o   Ensures timely submission of affirmative action
    reports.

o   Maintains liaison with minority and women's groups,
    and agencies concerned with the handicapped.

o   Consults with and provides assistance to METRO's Human
    Resources section and Labor Relations group regarding
    all aspects of personnel policies, procedures and
    employee relations practices as they related to
    affirmative action.

o   Evaluates the affirmative action plans of vendors,
    contractors, subcontractors, and suppliers bidding on
    contracts with METRO to determine their compliance
    with nondiscrimination requirements.

o   Advises prospective contractors and others on the
    steps necessary to bring them into compliance with
    METRO's requirements regarding equal employment
    opportunity and DBE participation.

o   Provides for and conducts compliance reviews deemed
    necessary to ensure effective program implementation.

o   Participates in employee, contractor, and supplier
    selection and review procedures and reviews potential
    contracts for compliance with METRO's Affirmative
    Action program.

o   Reviews and reports regarding compliance with Title VI
    of the 1964 Civil Rights Act, as amended, regarding
    equitable provision of transit services and related
    benefits.

o   Reports regularly to the General Manager and at least
    quarterly to the METRO Board on the status of METRO's
    Affirmative Action program.

o   Reviews requests for proposals and invitations for bid
    for inclusion of appropriate language regarding DBE
    requirements.

## DISADVANTAGED BUSINESS ENTERPRISE OFFICER

I.  **Summary of Responsibilities**

The Disadvantaged Business Enterprise Officer is responsible for the daily operations of METRO's DBE Program.

II. **Reporting Relationship**

The Disadvantaged Business Enterprise Officer reports directly to the AGM for Affirmative Action.

III. **Principal Duties**

The DBE Officer:

o   Analyzes available planning tools to project priority areas for DBE efforts.

o   Develops, monitors, and revises the DBE Affirmative Action Program.

o   Maintains and constantly updates a registry of disadvantaged businesses with specific information on expertise, work performance, and other information.

o   Works with departments in reviewing requests for proposals, invitations for bid, bids and contracts.

o   Assesses critical management needs of disadvantaged businesses.

o   Assists in securing management and technical assistance for the establishment, expansion, and overall development of DBEs.

o   Publicizes business opportunities to DBEs and assists such businesses in obtaining contracts and subcontracts.

o   Provides DBEs with information in sufficient time to prepare bids and quotations.

o   Attends pre-bid and pre-construction conferences to explain DBE requirements and respond to questions.

o   Participates on bid and proposal review panels to verify that DBE requirements have been met.

CHXPDF - www.faxoo.com

o    Reviews RFPs and IFBs for inclusion of appropriate language
     regarding DBE requirements.

o    Sets project-specific goals for DBE participation on METRO
     procurements.

o    Serves as a liaison with economic development organizations
     and agencies working with the minority community.

o    Assists in the arrangement of joint ventures between
     disadvantaged and non-disadvantaged firms and two or more
     disadvantaged firms.

o    Submits all reports as required by Federal regulations, the
     METRO Board and community.

CHAPDF - www.fastio.com

DISADVANTAGED BUSINESS SPECIALIST

I.    Summary of Responsibilities

The Disadvantaged Business Specialist is responsible for identifying and ensuring the utilization of small businesses owned and controlled by socially and economically disadvantaged individuals by METRO for either contracting or subcontracting opportunities.

II.   Reporting Relationship

The Disadvantaged Business Specialist reports to the DBE Officer.

III.  Principal Duties

The DBE Specialist:

o    Convenes Certification Review Committee (including appeals hearings) and presents verbal and written compliance review reports to the Committee for approval/denial.

o    Informs METRO Contract Administrator of Committee determination and requests intercession by Contract Administrator with prime contractor for DBE alternate if firm reviewed by Committee was denied certification.

o    Coordinates flow of information relating to contracts entered into by the Authority relative to DBE participation.

o    Develops and maintains contracts data system for routing and recording contract information.

o    Ensures that contractors submit accurately completed required forms in a timely manner and advises contractors on errors, deletions, omissions, etc.

o    Assists in answering inquiries regarding eligibility, availability, sources for participation as a DBE contractor.

o    Performs on-site investigations regarding DBE compliance.

o    Prepares reports on DBE utilization.

o    Conducts statistical analysis on compliance and DBE participation.

o    Develops, writes, and edits material for monthly newsletter.

CHcPDF - www.fastio.com

DISADVANTAGED BUSINESS ANALYST

I.    Summary of Responsibilities

      The Disadvantaged Business Analyst is responsible for updating
      and maintaining DBE Directory in the management information
      system and on hard copy files.    The DBE Analyst is also
      responsible for coordination of all contracts in the department
      and assisting in the statistical analysis of all DBE
      participation.

II.   Reporting Relationship

      The Disadvantaged Business Analyst reports to the METRO DBE
      Officer.

III.  Principal Duties

      The DBE Analyst:

      o    Coordinates and maintains logs for contract concurrence
           documents.

      o    Coordinates and maintains logs for DBE certification
           requests.

      o    Coordinates and maintains logs for pre-bid conferences.

      o    Maintains DBE file on all certified and non-certified
           vendors on computer data base.

      o    Provides contracts/procurement departments with DBE vendor
           list as required.

      o    Provides statistical reports on DBE file status and
           utilization.

      o    Prepares statistical reports on DBE commitments.   Assists
           in DBE certification.

      o    Monitors certification status.

      o    Provides variance reports, graphic analyses and descriptive
           statistics.

Case 4:93-cv-03651 Document 1 Filed in TXSD on 11/16/93 Page 26 of 106

## DEPARTMENTAL DBE RESPONSIBILITIES

Each METRO division/department has responsibility to ensure the successful operation of the DBE Program by:

1.  Including Affirmative Action/Equal Employment Opportunity and DBE Program requirements and provisions in all contracts and specifications and/or requests for Purchasing Authority;

2.  Preparing a detailed quarterly report identifying projected procurements, contract and bid solicitations to be let during that period. This report is to be sent to the AGM for Affirmative Action;

3.  Consulting with the DBE Officer on the availability of DBEs to perform prior to soliciting bids, requesting proposals, and requesting Purchasing Authority;

4.  Documenting efforts made to identify and do business with disadvantaged businesses;

5.  Furnishing such documentation as requested on appropriate forms and notices to the DBE Officer for review, evaluation, monitoring, and recommendations;

6.  Ensuring adequate lead time for the Affirmative Action Office to furnish assistance requested by the division/department relative to disadvantaged business participation; and

7.  Providing to the Affirmative Action Office preliminary contract and bid documents for review of EEO, DBE and Title VI language requirements and goals.

Two (2) METRO management-organization charts are shown as Exhibits 1 and 2. Exhibit 1 shows the reporting relationship of METRO's Affirmative Action Office. Exhibit 2 shows the internal structure of the Affirmative Action Office.

## V.

## DBE PROGRAM GOALS

A. PROCUREMENTS OTHER THAN TRANSIT VEHICLES

The overall annual goal for METRO's DBE Program (exclusive of funds to be expended for purchases of transit vehicles) is twenty-one percent (21%). Several factors have been used to develop these goals and form the basis for its determination including, but not limited to, the following:

1. The number and type of disadvantaged businesses currently identified and certified by METRO;

2. A projection of the number and types of contracts to be awarded by METRO and a projection of the number and types of DBEs likely to be available to compete for METRO contracts during a particular fiscal year, and;

3. Past results of METRO's efforts to contract with DBEs.

METRO's overall DBE goals are reviewed at least annually. The review process analyzes projected versus actual DBE participation during the previous fiscal year. When these overall annual goals expire, new overall goals and the methodology are set and submitted to DOT/UMTA for approval under separate cover. As annual goals are submitted to DOT, a notice is published in both major daily newspapers and several minority-owned newspapers announcing the proposed goals. The announcement also states that a description of the goal-setting methodology is available for public review during normal business hours at METRO's administrative offices for thirty days following publication of the notice and that the public has 45 days to comment.

METRO sets contract goals on each specific prime contract with subcontracting possibilities, which bidders or proposers must meet or exceed or demonstrate that such goal(s) can not be met despite their best efforts. METRO and contractors proposing on METRO projects shall at a minimum seek DBEs in the same geographic area in which they seek contractors or subcontractors generally for a given solicitation. If a contractor cannot meet METRO's DBE goals using DBEs from this geographic area, METRO or a contractor proposing on METRO contracts, as part of its efforts to meet METRO's DBE goal, is expected to expand its search to a wider geographic area.

DBE participation is counted as follows:

1.  Once a firm is determined to be an eligible DBE, in accordance with this policy, the total dollar value of the contract awarded to the DBE is counted toward the applicable DBE goals.

2.  METRO or a contractor may count toward its DBE goals a portion of the total dollar value of a contract with an eligible joint venture equal to the percentage of the ownership and control of the DBE partner in the joint venture.

3.  a.  METRO or a contractor may count toward its DBE goal only expenditures to DBEs that perform a commercially useful function in the work of a contract. A DBE is considered to perform a commercially useful function when it is responsible for execution of a distinct element of the work of a contract and carrying out its responsibilities by actually performing, managing, and supervising the work involved. To determine whether a DBE is performing a commercially useful function, METRO or a contractor shall evaluate the amount of work subcontracted, industry practices, and other relevant factors.

    b.  Consistent with normal industry practices, a DBE may enter into subcontracts. If a DBE contractor subcontracts a significantly greater portion of the work of the contract than would be expected on the basis of normal industry practices, the DBE shall be presumed not to be performing a commercially useful function. The DBE may present evidence to rebut this presumption to METRO. METRO's decision on the rebuttal of this presumption is subject to review by DOT.

4.  METRO or a contractor may count toward its DBE goals 60 percent of its expenditures for materials and supplies obtained from DBE regular dealers and 100 percent of such expenditures to a manufacturer, provided that the DBEs assume the actual and contractual responsibility for the provision of the materials and supplies as follows:

    a.  For purposes of this section, a manufacturer is a firm that operates or maintains a store, warehouse, or other establishment in which the materials or supplies required for the performance of the contract are

ClirPDF - www.fastio.com

bought, kept in stock, and regularly sold to the public in the usual course of business. To be a regular dealer, the firm must engage in, as its principal business, and in its own name, the purchase and sale of the products in question. A regular dealer in such bulk items as steel, cement, gravel, stone, and petroleum products need not keep such products in stock, if it owns or operates distribution equipment. Brokers and packagers shall not be regarded as manufacturers or regular dealers within the meaning of this section.

b.   A recipient or contractor may count toward its DBE goals the following expenditures to DBE firms that are not manufacturers or regular dealers:

   (1)   The fees or commissions charged for providing a <u>bona fide</u> service, such as professional, technical, consultant or managerial services and assistance in the procurement of essential personnel, facilities, equipment, materials or supplies required for performance of the contract, provided that the fee or commission is determined by the recipient to be reasonable and not excessive as compared with fees customarily allowed for similar services.

   (2)   The fees charged for delivery of materials and supplies required on a job site (but not the cost of the materials and supplies themselves) when the hauler, trucker, or delivery service is not also the manufacturer of or a regular dealer in the materials and supplies, provided that the fee is determined by the recipient to be reasonable and not excessive as compared with fees customarily allowed for similar services.

   (3)   The fees or commissions charged for providing any bonds or insurance specifically required for the performance of the contract, provided that the fee or commission is determined by the recipient to be reasonable and not excessive as compared with fees customarily allowed for similar services.

B. **DBE REQUIREMENTS FOR TRANSIT VEHICLE MANUFACTURERS**

METRO is bound by and will include the contract language required by 49 CFR, Part 23, Section 23.43, and Section 110(B) of the UMTA Grant Agreement in all contracts.

METRO requires all transit vehicle manufacturers who bid on federally-assisted contracts to have UMTA-approved DBE goals, pursuant to 49 CFR Part 23.67.

As a condition of being authorized to bid on transit vehicle procurements in which UMTA funds participate, each transit vehicle manufacturer shall certify that it has complied with the requirements of this section.

Each manufacturer shall establish and submit for the UMTA Administrator's approval an annual percentage overall goal. The base from which the goal is calculated shall be the amount of UMTA financial assistance participation in transit vehicle contracts to be performed by the manufacturer during the fiscal year in question. Funds attributable to work performed outside the United States and its territories, possessions and commonwealths shall be excluded from this base.

The manufacturer may make the certification called for in Paragraph 1 if it has submitted the goal required by Paragraph 2 and the UMTA Administrator has either approved it or not disapproved it.

Contractor Obligation - Contractors and subcontractors failing to carry out the above requirements are to be advised that failure to meet provisions in 1 and 2 above shall constitute a breach of contract and after the notification of the Department, may result in termination of the agreement or contract by METRO or such remedy as METRO and/or DOT deems appropriate.

## C. POLICY CONCERNING LEASES

METRO does not exclude DBEs from participation in business opportunities by entering into long-term exclusive agreements with non-DBEs for the operation of major transportation related activities or major activities for the provision of goods and services to the facility or to the public on the facility.

D.  **OPPORTUNITIES FOR BANKS OWNED AND CONTROLLED BY SOCIALLY AND ECONOMICALLY DISADVANTAGED INDIVIDUALS**

METRO will thoroughly investigate the full extent of services offered by banks owned and controlled by socially and economically disadvantaged individuals within METRO's jurisdictional area and determine the most feasible means to utilize the services of these banks.  In addition, METRO will encourage contractors and vendors to utilize the services of these banks.  This issue will be discussed during all pre-bid conferences.  METRO will share any information acquired in its investigations of the services offered by these banks with prime contractors to facilitate their utilization.

## VI.

### DBE CERTIFICATION PROCEDURES

To ensure that its DBE Program benefits only firms owned and
controlled by socially and economically disadvantaged individuals,
METRO certifies the eligibility of DBEs and joint ventures involving
DBEs that are named by the bidder/proposer in accordance with 49 CFR
Part 23.  METRO requires its prime contractors to make good faith
efforts to replace a DBE subcontractor that is unable to perform
successfully with another DBE.  METRO approves all substitutions of
subcontractors before contract award and during contract performance
in order to ensure that the substitute firms are eligible DBEs.  The
following guidelines have been adopted to ensure that METRO's DBE
Program benefits _bona fide_ businesses owned and controlled by
disadvantaged individuals.

METRO defines a DBE as a small business concern, as defined pursuant
to Section 3 of the Small Business Act and implementing regulations,
which is at least 51 percent owned and controlled by one or more
socially and economically disadvantaged individuals.  For the purpose
of this program, ownership and control are defined as follows:

1. Ownership means having the legal right of possession of all
   business assets, tangible and intangible.  This means that
   a person having ownership not only has legal rights to the
   firm's visible tangible assets but also intangible items,
   i.e., assumed name, trade marks, patents, labels.

2. Control means the right and power to exercise
   authority over the decision making which governs the
   affairs of the business.  The DBE owner(s) of the business
   must have the power and authority to develop and implement
   the policies and procedures that guide the day-to-day
   operations of the business.

METRO may, at its discretion, accept certifications made by other DOT
recipients.

## A.  DETERMINATION OF SMALL BUSINESS STATUS

In determining the eligibility of a business as a DBE, METRO will first determine whether or not the firm is a small business concern as defined by Section 3 of the Small Business Act. If a business is not a small business concern according to these standards, it is not eligible to participate as a small and disadvantaged business under 49 CFR Part 23, as amended. This is true even though the business may be owned and controlled by socially and economically disadvantaged individuals, and is eligible in all other respects.

To determine whether an enterprise is a small and disadvantaged business, both of the following criteria must be met:

a.   The enterprise must qualify as a small business concern; and

b.   The enterprise must be 51 percent owned and controlled by socially and economically disadvantaged individuals.

If the business has a valid certification as a socially and economically disadvantaged business by the SBA 8(a) certification, there is an irrebuttable presumption of eligibility for certification.

Small business size standards vary by type of industry. In addition to the individual industry size standards, DBE firms will be considered ineligible and will graduate from the DBE Program if their average annual gross receipts from all sources, including affiliates, over the previous three years exceed $14 million. METRO pays particular attention to size standard criteria and notes that SBA size standards operate in addition to the $14 million threshold noted above.

In determining whether a business is a small business concern, METRO shall apply the standards established by the Small Business Administration in 13 CFR Part 121, as specified below.

METRO applies the following size standards:

1.   <u>Subcontracts of $10,000 or less</u>:  A business is small if, including its affiliates, it does not have more than 500 employees.

2. <u>Subcontracts over $10,000 and prime contracts</u>:  A business is regarded as small if it meets the following criteria:

   a. <u>Construction</u>

      (1) General Construction (in which less than 75 percent of the work falls into one of the categories in Paragraph (2)):  The firm's average annual receipts for the three preceding fiscal years do not exceed $14 million.

      (2) Special trade contractors:

| Type of Firm | Maximum Average Annual Receipts in Preceding 3 Fiscal Years |
|---|---|
| Plumbing, heating (except electric) and air-conditioning | $5 million for all types of contractors on this list. |
| Painting, paperhanging, and decorating............... Masonry, stone setting, and other stonework......... Plastering, drywall, acoustical and insulation work......... Terazzo, tile, marble, and mosaic work............. Carpentering and flooring.. Floor laying and other floorwork............... Roofing and sheet metal work..................... Concrete work.............. Water well drilling........ Structural steel erection.. Glass and glazing work..... Excavating and foundation work..................... | |

CutePDF - www.fastio.com

| Type of Firm | Maximum Average Annual Receipts in Preceding 3 Fiscal Years |
|---|---|
| Wrecking and demolition work..................... Installation or erection of buildings equipment..... Special trade contractors, not elsewhere classified. | |

b.  <u>Suppliers of manufactured goods</u>:  The firm, including its affiliates, must not have more than 500 employees.

c.  <u>Service contractors</u>:

| Type of Firm | Maximum Average Annual Receipts in Preceding 3 Fiscal Years (in millions of dollars) |
|---|---|
| Engineering................ | $2.5 |
| Janitorial and custodial... | 4.5 |
| Computer programming or data processing......... | 4 |
| Computer Maintenance....... | 7 |
| Protective Services........ | 4.5 |
| Others not mentioned in 13 CFR 121.3-8(e)....... | 2 |

CMPDF - www.fasoo.com

## B. DETERMINATION OF OWNERSHIP AND CONTROL

The following additional standards shall be used in determining whether a firm is 51 percent owned by socially and economically disadvantaged individuals, and whether one or more of the owners control the firm. Businesses aggrieved by the determination may appeal in accordance with procedures set forth in Exhibit 3.

1.  Bona fide disadvantaged status shall be established on the basis of the individual's claim that he or she is a member of a disadvantaged group and is so regarded by that particular disadvantaged community. However, METRO is not required to accept this claim if it determines the claim to be invalid.

2.  An eligible DBE shall be an independent business, and

    a.  The ownership and control by disadvantaged persons shall be real, substantial, and continuing and shall go beyond the pro forma ownership of the firm as reflected in its ownership documents.

    b.  The disadvantaged owners shall enjoy the customary incidents of ownership and shall share in the risks and profits commensurate with their ownership interests, as demonstrated by an examination of the substance rather than form of arrangements.

    c.  Recognition of the business as a separate entity for tax or corporate purposes is not necessarily sufficient for recognition as a DBE.

    d.  In determining whether a potential DBE is an independent business, METRO shall consider all relevant factors, including the date the business was established, the adequacy of its resources for the work of the contract, and the degree to which financial, equipment leasing, and other relationships with non-disadvantaged firms vary from industry practice.

3.  The disadvantaged owners shall also possess the power to direct or cause the direction of the management and policies of the firm and to make the day-to-day, as well as major, decisions on matters of management, policy and operations. The firm shall not be subject to any formal or informal restrictions which limit the customary discretion of the disadvantaged owners. There shall be no restrictions through, for example, by-law provisions,

CImPDF - www.tesler.com

partnership agreements, or charter requirements for cumulative voting rights or otherwise that prevent the disadvantaged owners, without the cooperation or vote of any owner who is not disadvantaged, from making a business decision of the firm.

4.  If the owners of the firm who are not disadvantaged are disproportionately responsible for the operation of the firm, then the firm is not controlled by disadvantaged individuals and shall not be considered a DBE within the meaning of this Program. Where the actual management of the firm is contracted out to individuals other than the owners, those persons who have the ultimate power to hire and fire the managers can, for the purposes of this Program, be considered as controlling the business.

5.  All securities which constitute ownership and/or control of a corporation for purposes of establishing it as a DBE under this Program shall be held directly by disadvantaged individuals. No securities held in trust or by any guardian for a minor shall be considered as held by disadvantaged individuals in determining the ownership or control of a corporation.

6.  The contribution of capital or expertise by the disadvantaged owners to acquire their interests in the firm shall be real and substantial. Examples of insufficient contributions include a promise to contribute capital, a note payable to the firm or its owners who are not socially and economically disadvantaged, or the mere participation as an employee, rather than as a manager.

In addition to the foregoing standards, METRO gives special consideration to the following circumstances in determining DBE eligibility:

1.  Newly formed firms and firms whose ownership and/or control has changed since the date of the advertisement of the contract are closely scrutinized to determine the reasons for the timing of the formation of or change in the firm.

2.  A previous and/or continuing employer-employee relationship between and among present owners is carefully reviewed to ensure that the employer-owner has management responsibilities and capabilities discussed herein.

3.  Any relationship between a DBE and a non-minority owned business which has an interest in the DBE is carefully reviewed to determine if the interest of the non-minority conflicts with the ownership and control requirements of DBE definition and guidelines.

4. A joint venture is eligible under this program if the DBE partner of the joint venture meets the standards for an eligible DBE set forth above, and the DBE partner is responsible for a clearly defined portion of the work to be performed and shares in the ownership, control, management responsibilities, risks, and profits of the joint venture.

5. A business wishing to be certified as a DBE or joint venture DBE by METRO, shall cooperate with METRO by supplying additional information which may be requested in order to make a determination.

6. Once certified, a DBE shall update its submission annually by submitting a new Schedule A or certifying that the Schedule A on file is still accurate. If at any time there is a change in ownership or control of the firm, the firm shall submit a new Schedule A.

7. Except as provided in Exhibit 3, the denial of certification by METRO shall be final for that contract and other contracts being let by METRO at the time of the denial of certification. DBEs and joint ventures denied certification may correct deficiencies in their ownership and control and apply for certification only for future contracts.

METRO shall safeguard from disclosure to unauthorized persons information that reasonably may be regarded as confidential business information, consistent with federal, state, and local law.

C. <u>INFORMATION TO ASSIST IN DETERMINING LEGITIMACY OF DBEs</u>

The following information is requested on the application for DBE Certification (Schedule A):

1.    Name, address, phone, nature of business, years business has been established, percent of disadvantaged ownership of the business entity and identification of all ownership in terms of the name of individuals or corporations and their percent of ownership.

2.    For corporations, a copy of articles of incorporation and charter; for partnerships, a copy of partnership agreement and assumed name certificate; and for proprietorships, a copy of assumed name certificate.

3.    Evidence of authority to do business in the state, as well as locally, and all necessary business licenses.

4.    Identification of any stock options or other ownership options that are outstanding, and any loans between owners or between owners and third parties relevant to the business entity.

5.    Identification of the officers of the corporation or those charged with operating the business, their qualifications, their responsibilities and their authority in operating the business.

6.    Copy of the current audited balance sheets and operating statements for the entity.

7.    Name and title of individual who decides what jobs the firm will take.

8.    Name and title of individual who obtains, negotiates, and signs for bonds and insurance.

9.    Name of bonding company, sources of letters of credit, etc.

10.   Trade references.

11.   Previous certifications or denials of certification as a DBE.

12.   Percentage of work to be performed by business's own employees on the contract.

13.   If business has operated more than one year, a copy of two previous year's Federal Tax Returns.

The foregoing information relevant to disadvantaged businesses and contractors is in affidavit form and must be subscribed and sworn to by the authorized representative of the business entity.

D.  **INFORMATION TO ASSIST IN DETERMINING THE LEGITIMACY OF JOINT VENTURES**

The following information is requested on the application for joint venture certification (Schedule B):

1.  Name, address, phone, nature of business.

2.  Number of years each entity has been in business.

3.  Percent of disadvantaged participation in terms of profit and loss sharing.

4.  Capital contributions by each joint venturer and accounting therefore.

5.  Financial controls of joint venture, e.g., will a separate cost center be established; which venturer will be responsible for keeping the books; how will the expense therefore be reimbursed; the authority of each joint venturer to commit or obligate the other?

6.  Any ownership, options for ownership or loans between the joint venturers - identify terms thereof.

7.  Estimated contract cash flow for each joint venturer.

8.  All personnel, their crafts, and positions and whether they are employees of the disadvantaged or the majority firm, or the joint venture.

9.  How and by whom the administrative office will be supervised.

10. How and by whom the on-site work will be supervised.

11. Which joint venturer will be responsible for material purchases including the estimated cost thereof; how will the purchases be financed.

12. Which joint venturer will provide equipment, the estimated cost thereof; how will the equipment be financed.

13. The experience and business qualifications of each joint venturer.

14. Evidence of authority to do business in the state, as well as locally, to include all necessary business licenses.

An affidavit attesting to the accuracy of the above will be subscribed and sworn to by the principals of each joint venture.

E. **GUIDANCE FOR MAKING DETERMINATIONS FOR SOCIAL AND ECONOMIC DISADVANTAGE**

Before making any determination of social and economic disadvantage, METRO will determine whether a firm is a small business concern. If it is not, then the firm is not eligible to be considered a disadvantaged business, and no further determinations need be made.

A third party may challenge; METRO will follow the challenge procedure described in Exhibit 4.

Any person who has been certified by SBA, under its 8(a) program, as socially and economically disadvantaged is automatically considered to be a socially and economically disadvantaged individual. However, the absence of an 8(a) certification does not mean that an individual or firm is ineligible.

METRO will make its own judgement about whether an individual is in fact a member of one of the presumptive groups. If an individual has not maintained identification with the group to the extent that he or she is commonly recognized as a group member, it is unlikely that he or she will, in fact, have suffered the social disadvantage which members of the group are presumed to have experienced. If an individual has not held himself or herself out to be a member of one of the groups, has not acted as a member of a community of disadvantaged persons, and would not be identified by persons in the population at large as belonging to the disadvantaged group, the individual should be required to demonstrate social disadvantage on an individual basis.

Individuals who are not presumed to be socially and economically disadvantaged by virtue of membership in one of the presumptive groups may, nevertheless, be found to be socially and economically disadvantaged on a case-by-case basis. If an individual requests that his or her business be certified as an eligible disadvantaged business, METRO, as part of its certification process, is responsible for making a determination of social and economic disadvantage.

In making determinations of social and economic disadvantage, METRO will be guided by the following standards, which have been adopted from materials prepared by the SBA.

1. **Elements of Social Disadvantage**

In order to determine that an individual is socially disadvantaged, METRO must conclude that the individual meets the following standards.

a. The individual's social disadvantage must stem from his or her color; national origin; gender; physical handicap; long-term residence in an environment isolated from the mainstream of American society; or other similar cause beyond the individual's control. The individual cannot establish social disadvantage on the basis of factors which are common to small business persons who are not socially disadvantaged. For example, because of their marginal financial status, many small businesses have difficulty obtaining credit through normal banking channels. An individual predicating a social disadvantage claim on denial of bank credit to his or her firm would have to establish that the denial was based on one or more of the listed causes (or similar causes) not simply on the individual's or the firm's marginal financial status.

b. The individual must demonstrate that he or she has personally suffered social disadvantage, not merely claim membership in a non-designated group which could be considered socially disadvantaged. This can be achieved, for example, by describing specific instances of discrimination which the individual has experienced, or by recounting in some detail how his or her development in the business world has been thwarted by one or more of the listed causes or similar causes. As a general rule, the more specific an explanation of how one has personally suffered social disadvantage, the more persuasive it will be. In assessing such facts, METRO will place substantial weight on prior administrative or judicial findings of discrimination experienced by the individual. Such findings, however, are not necessarily conclusive evidence of an individual's social disadvantage, nor are they a prerequisite for establishing social disadvantage.

c. The individual's social disadvantage must be rooted in treatment which he or she has experienced in American society, not in other countries.

Case 4:93-cv-03651 Document 1 Filed in TXSD on 11/16/93 Page 45 of 106

d. The individual's social disadvantage must be chronic, long-standing, substantial, not fleeting or insignificant. Typically, a number of incidents illustrating a person's social disadvantage, occurring over a substantial period of time, would be necessary to make a successful claim. Usually, only by demonstrating a series of obstacles which have impeded one's progress in the business world can an individual demonstrate chronic, long-standing, and substantial disadvantage.

e. The individual's social disadvantage must have negatively affected his or her entry into, and/or advancement in, the business world. The closer the individual can link social disadvantage to impairment of business opportunities, the stronger the case. For example, METRO would place little weight on annoying incidents experienced by an individual which have had little or no impact on the the person's career or business development. On the other hand, METRO would place greater weight on concrete occurrences which have tangibly disadvantaged an individual in the business world.

2. Evidence of Social Disadvantage

METRO will entertain any relevant evidence in support of an individual's claim of social disadvantage. In addition to a personal statement from the individual claiming to be socially disadvantaged, such evidence may include, but is not limited to: third party statement, copies of administrative or judicial findings of discrimination, and other documentation in support of matters discussed in the personal statement. METRO will particularly consider and place emphasis on the following experiences of the individual, where relevant: education, employment, and business history. However, the individual may present evidence relating to other matters as well. Moreover, the attainment of a quality education or job should not absolutely disqualify the individual from being found socially disadvantaged if sufficient other evidence of social disadvantage is presented.

a. Education - METRO will consider, as evidence of an individual's social disadvantage, denial of equal access to business or professional schools, denial of equal access to curricula, exclusion from social and

professional association with students and teachers, denial of education honors, social patterns or pressures which have discouraged the individual from pursuing a professional or business education, and other similar factors.

b.   <u>Employment</u> - METRO will consider, as evidence of an individual's social disadvantage, discrimination in hiring, discrimination in promotions and other aspects of professional advancement, discrimination in pay and fringe benefits, discrimination in other terms and conditions of employment, retaliatory behavior by an employer, social patterns or pressures which have channeled the individual into non-professional or non-business fields, and other similar factors.

c.   <u>Business History</u> - METRO will consider, as evidence of an individual's social disadvantage, unequal access to credit or capital, acquisition of credit under unfavorable circumstances, discrimination in receipt (award and/or bid) of government contracts, discrimination by potential clients, exclusion from business or professional organizations, and other similar factors which have retarded the individual's business development.

3.   <u>Economic Disadvantage</u>

METRO will always make a determination of social disadvantage before proceeding to made a determination of economic disadvantage. If METRO determines that the individual is not socially disadvantaged, it is not necessary to make the economic disadvantage determination.

As a general rule, economically disadvantaged individuals are socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities, as compared to others in the same or similar line of business and competitive market area who are not socially disadvantaged. In determining the degree of diminished credit and capital opportunities of a socially disadvantaged individual, consideration will be given to both the disadvantaged individual and the applicant concern with which he or she is affiliated.

It is the responsibility of applicant firms and their owners to provide to METRO information about their economic situation when they seek eligibility as disadvantaged businesses.

CVtPDF - www.fastio.com

CVisPDF - www.fasisi.com

EXHIBIT 3

## APPEALS OF DENIAL OF CERTIFICATION AS A DBE

Any business which believes that it has been wrongly denied
certification as a DBE or joint venture under the provisions
specified herein may file an appeal in writing, signed and dated with
METRO. The appeal shall be filed no later than 10 days after the
date of denial of certification. The AGM for Affirmative Action may
extend the time for filing or waive the time limit in the interest of
justice. Third parties who have reason to believe that another firm
has been wrongly denied or granted certification as a DBE or joint
venture may advise the AGM for Affirmative Action. This information
is not considered an appeal pursuant to this action.

The AGM for Affirmative Action ensures that a prompt investigation is
conducted.

1. STATUS OF CERTIFICATION DURING THE INVESTIGATION

    The AGM for Affirmative Action may at his/her discretion
    deny the DBE or joint venture in question eligibility to
    participate as a DBE in METRO contracts let during the
    pendancy of the investigation, after providing the DBE or
    joint venture in question an opportunity to show cause by
    written statement to the AGM for Affirmative Action why
    this should not occur.

2. COOPERATION IN INVESTIGATION

    All parties shall cooperate fully with the investigation.
    Failure or refusal to furnish questioned information or
    other failure to cooperate is a violation of this section.

3. DETERMINATIONS

    The AGM for Affirmative Action makes one of the following
    determinations and informs the DBE or joint venture in
    writing of the reasons for the determination:

    a.   The DBE or joint venture is certified; or,

    b.   The DBE or joint venture is not eligible to be
         certified and is denied eligibility to participate as
         a DBE in METRO contracts until a new application for
         certification is approved by METRO.

CutPDF - www.fasoo.com

Any firm which believes that it has been wrongly denied certification as a DBE or joint venture in any direct or DOT-assisted contract may file an appeal in writing, signed and dated, with the DOT pursuant to the Department of Transportation's DBE regulations at 49 CFR Part 23. The appeal shall be filed no later than 180 days after the date of denial of certification.

1. <u>Decision to investigate</u>. The Secretary ensures that a prompt investigation is made pursuant to prescribed DOT Title VI investigation procedures.

2. <u>Status of certification during the investigation</u>. The Secretary may at his/her discretion, deny the DBE or joint venture in question eligibility to participate as an DBE in DOT-assisted contracts let during the pendancy of the investigation, after providing an opportunity to show cause by written statement to the Secretary why this should not occur.

3. <u>Cooperation in investigation</u>. All parties shall cooperate fully with the investigation. Failure or refusal to furnish requested information or other failure to cooperate is a violation of this part.

4. <u>Determinations</u>. The Secretary makes one of the following determinations and informs the DBE or joint venture in writing of the reasons for the determination:

   a. The DBE or joint venture is certified; or

   b. The DBE or joint venture is not eligible to be certified and is denied eligibility to participate as a DBE in any direct or DOT-assisted contract until a new application for certification is approved by the recipient.

EXHIBIT 4

CHALLENGE PROCEDURE

METRO's challenge procedure to determine whether an individual presumed to be socially and economically disadvantaged, as provided in 23.62 is, in fact, socially and economically disadvantaged shall provide as follows:

1. Any third party may challenge the socially and economically disadvantaged status of any individual (except an individual who has a current 8(a) certification from the Small Business Administration) presumed to be socially and economically disadvantaged if that individual is an owner of a firm certified by or seeking certification from METRO as a disadvantaged or woman-owned business. The challenge shall be made in writing to METRO.

2. With its letter, the challenging party shall include all information available to it relevant to a determination of whether the challenged party is in fact socially and economically disadvantaged.

3. METRO shall determine, on the basis of the information provided by the challenging party whether there is reason to believe that the challenged party is in fact not socially and economically disadvantaged.

   a. If METRO determined that there is no reason to believe that the challenged party is not socially and economically disadvantaged and that the business is not owned by socially and economically disadvantaged individuals, METRO shall so inform the challenging party in writing.

   b. If METRO determines that there is reason to believe that the challenged party is not socially and economically disadvantaged or the business is not owned by socially and economically disadvantaged individuals, METRO shall begin a proceeding as provided in Paragraphs 4, 5, and 6 of this section.

4. METRO shall notify the challenged party in writing that his or her status as a socially and economically disadvantaged individual or business owner has been challenged. The notice shall identify the challenging party and summarize the grounds for the challenge. The notice shall also require the challenged party to provide to METRO, within a reasonable time, information sufficient to permit METRO to evaluate his or her status as a socially and economically disadvantaged individual or business owner.

5. METRO shall evaluate the information available to it and make a proposed determination of the social and economic disadvantage of the challenged party. METRO shall notify both parties of this proposed determination in writing, setting forth the reasons for its proposal. METRO shall provide an opportunity to the parties for an informal hearing, at which they can respond to this proposed determination in writing and in person.

6. Following the informal hearing, METRO shall make a final determination. METRO shall inform the parties in writing of the final determination, setting forth the reasons for its decision.

7. In making the determinations called for in Paragraphs 3, 4, and 5 of this section, METRO shall use the standards set forth in 49 CFR, Part 23, Subpart D, Appendix C.

8. During the pendency of a challenge under this section, the presumption that the challenged party is a socially and economically disadvantaged individual or that the business is in fact owned by socially and economically disadvantaged individuals shall remain in effect.

The final determination of METRO under subparagraphs 3 and 6 may be appealed to the Department of Transportation by the adversely affected party under the procedures of 23.55 as outlined in Exhibit 3.

EXHIBIT 6

METROPOLITAN TRANSIT AUTHORITY
DISADVANTAGED BUSINESS ENTERPRISES
and
EQUAL EMPLOYMENT OPPORTUNITY
REQUIREMENTS
for
CONSTRUCTION CONTRACTS AND AGREEMENTS
(Federal Funds)

Pursuant to Title VI and VII of the Civil Rights Act of 1964, as amended, Sections 110 and 111 of the UMTA Agreement (terms and conditions), Executive Order 11246 as amended by Executive Order 11375 and implemented in the Houston SMSA area by the Department of Labor's Office of Federal Contract Compliance Programs (OFCCP), Executive Order 11625 concerning the utilization of Disadvantaged Business Enterprises (DBEs), Department of Transportation Order 4000.7A, Urban Mass Transportation Administration Circulars 1155.1 and 4716.1A, 49 CFR Part 23, and the Metropolitan Transit Authority Board policies on equal employment opportunity and the utilization of DBEs, the Contractor is required to take certain actions designed to assure equitable participation of socially and economically disadvantaged individuals in its workforce and provide maximum feasible opportunity for the participation of DBEs.

Part I details the Equal Employment Opportunity requirements; Part II outlines DBE requirements and Part III outlines obligations under Title VI of the Civil Rights Act of 1964, as amended. A BID WHICH FAILS TO INCLUDE THE DBE ASSURANCE STATEMENT AND THE PROPOSED SCHEDULE OF DBE PARTICIPATION AND OTHER DATA REQUIRED IN PARTS I AND III INCLUDED IN THE FORMS FOR BIDDING SHALL BE NON-RESPONSIVE AND SHALL BE REJECTED.

PART I - EQUAL EMPLOYMENT OPPORTUNITY

A. Federal Nondiscrimination Provisions Pursuant to 41 CFR 60-1.4(b) (Equal Opportunity Clause)

During the performance of this contract, the Contractor agrees as follows:

1. The Contractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin. The Contractor shall take affirmative action to ensure that applicants are employed, and that employees are treated during employment without regard to their race, religion, color, sex, age,

or national origin. Such action shall include, but not be limited to the following: employment, upgrading, demotion or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The Contractor agrees to post in conspicuous places, available to employees, and applicants for employment, notices to be provided setting forth its provisions of this nondiscrimination clause.

2.    The Contractor will, in all solicitations or advertisements for employees placed by or on behalf of the Contractor, state that all qualified applicants will receive consideration for employment without regard to race, religion, color, sex or national origin.

3.    The Contractor will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice to be provided advising the said labor union or workers' representatives of the contractor's commitments under this section, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

4.    The Contractor will comply with all provisions of Executive Order 11246 of September 24, 1965, as amended and of the rules, regulations and relevant orders of the Secretary of Labor.

5.    The Contractor will furnish all information and reports, including the METRO Employment Data Report, required by Executive Order 11246 of September 24, 1965, and by rules, regulations and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records and accounts by the Administering Agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and others.

6.    In the event of the Contractor's noncompliance with the nondiscrimination clauses of this contract or with any of the said rules, regulations or orders, this contract may be cancelled, terminated, or suspended in whole or in part and the Contractor may be declared ineligible for further government contracts or federally assisted construction contracts in accordance with procedures authorized in Executive Order 11246 of September 24, 1965, and such other sanctions may be imposed and remedies invoked as provided in Executive Order 11246 of September 24, 1965, or by rule, regulation, or order, of the Secretary of Labor, or as otherwise provided by law.

7.      The Contractor will include a citation to 41 CFR, Section 60-1.4(b) (1) and (c) and the provisions of paragraphs (1) through (7) in every subcontract or purchase order unless exempted by rules, regulations or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order 11246 of September 24, 1965, so that such provisions shall be binding upon each subcontractor or vendor. The Contractor will take such action with respect to any subcontractor or purchase order as the Urban Mass Transportation Administration may direct as a means of enforcing such provisions, including sanctions for noncompliance; provided, however, that in the event the Contractor becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction by the Urban Mass Transportation Administration, the Contractor may request the United States to enter into such litigation to protect the interest of the United States.

B.      Equal Employment Opportunity Construction Contract Specifications Pursuant to Executive Order 11246 and METRO Policy.

        1.      As used in these specifications:

                (a)     "Covered areas" means the Houston, Texas, Standard Metropolitan Statistical Area (SMSA) which includes Harris, Liberty, Montgomery, Fort Bend, Brazoria and Waller counties;

                (b)     "Director" means Director, Office of Federal Contract Compliance Programs (OFCCP), United States Department of Labor, or any person to whom the Director delegates authority;

                (c)     "Employer Identification Number" means the Federal Social Security number used on the Employer's Quarterly Federal Tax Return, U.S. Treasury Department Form 941;

                (d)     "Minority" includes:

                        (i)     Black (all persons having origins in any of the Black African racial groups not of Hispanic origin);

                        (ii)    Hispanic (all persons of Mexican, Puerto Rican, Cuban, Central or South American or other Spanish or Portuguese culture or origin, regardless of race);

VII.

**PROCEDURES TO ENSURE THAT DBEs HAVE AN EQUITABLE OPPORTUNITY TO COMPETE FOR CONTRACTS AND SUBCONTRACTS**

Specific affirmative action procedures to be utilized by the DBE staff and contracts/procurement staff to ensure maximum practicable opportunities for DBE business participation include the following:

1. Assist DBEs in obtaining insurance and surety bonding where necessary in the performance of contracts, through utilizing methods including but not necessarily limited to:

   a. Packaging contracts so that dollar amounts do not require bonding;

   b. Encouraging prime contractors to waive bonding or assist disadvantaged subcontractors in obtaining bonding;

   c. Encouraging stage bonding where feasible, when bonding is carried over from one project stage to the next; and

   d. Relaxing bonding requirements for projects less than $25,000;

2. Encourage the formation of joint ventures among DBEs and between disadvantaged and non-disadvantaged firms which provide opportunity for DBEs to gain experience. METRO's DBE staff will assist prime contractors in identifying interested disadvantaged firms for subcontracts and joint ventures;

3. Provide information on METRO's organization and contractual needs and offer instructions on bid specifications, procurement policy, procedures, and general bidding requirements;

4. Provide specifications and requests for proposals to the DBE business community in a timely manner to allow DBEs adequate time to develop responsible and responsive bids, quotations, and proposals. In instances where the cost of obtaining specifications or requests for proposal is prohibitive, copies of the material will be made available at ·no charge to disadvantaged business development agencies;

METRO will allow a reasonable amount of time for completion of bids and proposals. Except in the case of emergency needs, the minimum time allowed for completion of bids will be fifteen (15) days.

CHPDF - www.fastio.com

5.    Establish prorated payment and delivery schedules where
      feasible, to minimize cash flow problems faced by small
      firms.   METRO will provide guidance to DBE contractors
      regarding maintenance of positive cash flow in order that
      current obligations can be met;

6.    Use the least complicated bid forms appropriate for each
      procurement solicitation;

7.    Hold pre-bid conferences to explain DBE requirements as
      well as forms that must be submitted with a bid or
      proposal;

8.    Permit bidders/proposers to review and evaluate successful
      bid documents of similar procurements and use debriefing
      sessions to explain why certain bids were unsuccessful;

9.    Provide projected procurement information and contracting
      schedules through the METRO Advisor and other outreach
      efforts;

10.   Conduct   internal   information   workshops   to   inform   and
      acquaint METRO staff with the goals and objectives of
      METRO's Affirmative Action Plan, and to sensitize them to
      the problems of DBEs;

11.   Maintain records showing specific efforts to identify and
      award contracts to DBEs, and establish a monitoring system
      to   ensure   that   all   contractors,   subcontractors,
      consultants,   and   vendors   comply   with   contract
      specifications related to disadvantaged business enterprise
      utilization;

12.   Develop a written handbook containing the following:

      a.    Procedures outlining specific steps on how to bid;

      b.    Prerequisites for bidding on contracts;

      c.    Information on how plans and specifications can be
            obtained;

      d.    Names of persons to contact concerning questions on
            bid documents;

      e.    Names of procurement officers and office hours;

      f.    Types of supplies and services purchased; and

Case 4:93-cv-03651 Document 1 Filed in TXSD on 11/16/93 Page 58 of 106

g. Explanations of standard contract implementation procedures and requirements, concerning such matters as timely performance of work, contract changes, and payment schedules.

13. Inform DBEs of bid notices and specifications related to their capability by placing bid notices in the Dodge Bulletin, major local newspapers, as well as minority and female-interest periodicals. Bid notices will also be sent to DBE trade associations, technical assistance agencies, minority and female economic development groups, and DBEs with capabilities relevant to the bid notice as identified by METRO's DBE data bank. Bid specifications will be made available to DBE contractor associations and technical assistance agencies. Lists of potential majority firms bidding as primes are also available to DBEs; and

14. Establish a Certification Review Committee to assist in certification of DBEs and to provide technical assistance on legal and financial matters.

METRO's DBE program will assist DBEs in overcoming barriers to program participation. This assistance will be offered directly by METRO, as well as by referral to other assistance agencies through established, comprehensive, and continuous programs. Businesses requiring management and technical assistance will be identified through a questionnaire, personal experience with these businesses, and requests for assistance.

METRO will offer the following assistance directly to disadvantaged businesses:

1. METRO staff will provide information on METRO contractual requirements and projected procurement opportunities.

2. METRO staff will provide counseling and training sessions for disadvantaged businesses. Responsible METRO staff will be available to interested business representatives to explain (in detail) instructions for preparation of bid specifications, METRO procurement policies, procedures and general bid requirements. The Disadvantaged Business Enterprise Officer will coordinate and follow-up all requests for assistance to insure that all necessary information was provided.

3.   METRO will provide coordination and referral to existing business development organizations.

4.   Upon request, DBEs will be provided with information on specific reasons for unsuccessful bids through debriefing sessions.

5.   METRO will review individual solicitations to ensure that insurance and bonding provisions are not excessive. Assistance in obtaining insurance and bonding will be provided to businesses.

6.   METRO will provide intensive workshops and training sessions on identified disadvantaged business problem areas, i.e., pricing and estimating, joint venture formation, accounting principles, marketing, etc.

7.   Information on METRO's DBE program will be disseminated through written materials, seminars, workshops, and specialized assistance to individual firms.

Case 4:93-cv-03651 Document 1 Filed in TXSD on 11/16/93 Page 60 of 106

A. **A DESCRIPTION OF THE METHODS BY WHICH METRO WILL REQUIRE SUB-RECIPIENTS, CONTRACTORS, AND SUBCONTRACTORS TO COMPLY WITH APPLICABLE DBE REQUIREMENTS**

All DOT-associated contracts, including those with transit vehicle manufacturers, shall contain the following contract language:

"It is the policy of the Department of Transportation that disadvantaged business enterprises as defined in 49 CFR Part 23 as amended shall have the maximum opportunity to participate in contracts financed in whole or in part with federal funds under this agreement. Consequently the DBE requirements of 49 CFR Part 23 as amended apply to this agreement."

"METRO or its contractor agrees to ensure that disadvantaged business enterprises as defined in 49 CFR Part 23 as amended have the maximum opportunity to participate in the performance of contracts and subcontracts financed in whole or in part with federal funds provided under this agreement. In this regard METRO and its contractors shall take all necessary and reasonable steps in accordance with 49 CFR Part 23 as amended to ensure that disadvantaged business enterprises have the maximum opportunity to compete for and perform contracts. METRO and its contractors shall not discriminate on the basis of race, color, national origin or sex in the award and performance of DOT-assisted contracts."

METRO Affirmative Action Office staff are available to assist contractors and subcontractors in drafting and implementing their DBE programs for using DBEs. As a standard procedure, such assistance includes:

1. Clear identification of METRO's DBE provisions in all METRO solicitations;

2. Pre-proposal/bid conference to explain METRO's DBE provisions and program;

3. Identification of certified DBEs per METRO solicitation including a list of certified DBEs is available to all document holders;

4. Lists of document holders are available to interested DBEs; and

5. METRO staff are available to assist bidders/proposers in developing their DBE programs.

Additionally, METRO staff monitors DBE participation levels on projects throughout the duration of a contract. Contractors violating contract provisions regarding DBE participation are subject to sanctions, including contract termination.

Information dissemination and communication with DBEs is an integral part of METRO's DBE Program. As part of its outreach program, METRO's DBE staff will solicit input from representatives of disadvantaged businesses, trade associations and community organizations. This input will serve several important functions including:

1.    Providing information to identify additional DBE firms;

2.    Assisting in refining DBE Program goals and procedures; and

3.    Providing an independent assessment of the effectiveness of METRO's DBE Program.

CMPDF - www.fastio.com

**B.** **MEANS TO ENSURE THAT COMPETITORS MAKE GOOD FAITH EFFORTS TO MEET DBE CONTRACT GOALS**

For all contracts for which contract goals have been established, METRO shall in the solicitation inform competitors that the competitors will be required to submit DBE participation information to METRO and that the award of the contract will be conditioned upon satisfaction of the requirements established by METRO. The apparent successful competitor shall submit, at time of the bid opening or proposal review, the following information:

1. The name and address of DBE firms that will participate in the contract;

2. The description of the work each named DBE will perform; and

3. The dollar amount of participation by each named DBE firm.

If the DBE participation submitted by the competitor does not meet the DBE contract goals, the competitor must submit evidence demonstrating that good faith efforts were made to meet the goals.

To determine sufficient good faith efforts to meet the DBE contract goal, a bidder/proposer shall document the steps it has taken to obtain DBE participation, including but not limited to the following:

1. Attendance at a pre-bid meeting, if any, scheduled by METRO to inform DBEs of subcontracting opportunities under a given solicitation;

2. Advertisement in general circulation media, trade association publications, and minority-focus media for at least 15 days before bids or proposals are due;

3. Written notification to DBEs that their interest in the contract is solicited;

4. Efforts made to select portions of the work proposed to be performed by DBEs in order to increase the likelihood of achieving the stated goal;

5. Efforts to negotiate with DBEs for specific sub-bids including at a minimum:

    a. The names, addresses, and telephone numbers of DBEs that were contacted;

   b.    A description of the information provided to DBEs regarding the plans and specifications for portions of the work to be performed; and

   c.    A statement of why additional agreements with DBEs were not reached.

6.    Concerning each DBE the competitor contacted but rejected as unqualified, the reasons for the competitor's conclusion; and

7.    Efforts made to assist the DBEs contacted that needed assistance in obtaining bonding or insurance required by the competitor or METRO.

To determine whether a competitor that has failed to meet DBE goals may be awarded the contract, METRO will determine whether the efforts the bidder made to obtain DBE participation were "good faith efforts." Efforts that are merely pro forma are not good faith efforts to meet the goals. Efforts to obtain DBE participation are not good faith efforts to meet the goals, even if they are sincerely motivated, if given all relevant circumstances, efforts could not reasonably be expected to produce a level of DBE participation sufficient to meet the goals. In order to award a contract to a bidder that has failed to meet DBE contract goals, METRO will determine whether the bidder actively and aggressively made efforts to meet METRO DBE goals.

Competitors that fail to meet DBE goals and fail to demonstrate sufficient reasonable efforts shall not be eligible to be awarded the contract.

To ensure that all obligations under contracts awarded to DBEs are met, METRO shall review the contractor's DBE involvement efforts during the performance of the contract. The contractor shall bring to the attention of METRO any situation in which regularly scheduled progress payments are not made to DBE subcontractors.

C.  **PROCEDURES TO REQUIRE THAT PARTICIPATING DBEs ARE IDENTIFIED BY NAME BY COMPETITORS FOR CONTRACTS**

METRO shall indicate, in solicitations for contracts that provide opportunities for DBE participation, goals for the use of firms owned and controlled by socially and economically disadvantaged individuals. Solicitations shall require all bidders/proposers to submit a written assurance of meeting the goals in their bids or proposals. Bids must also include a proposed schedule of DBE participation which lists the names of DBE subcontractors, a description of the work each is to perform, and the dollar value of each proposed DBE subcontract. If the DBE participation does not meet the DBE contract goals, the bidders/proposers must submit sufficient information and evidence demonstrating that the bidder/proposer made good faith efforts to meet the goals. Bidders and proposers are required to submit this information prior to the issuance of the Notice-to-Proceed and bidders and proposers are so informed at the time of solicitation. Agreements between a bidder/proposer and a DBE in which the DBE promises not to provide subcontracting quotations to other bidders/proposers shall be prohibited.

## VIII.

### MAINTENANCE OF RECORDS AND REPORTS

METRO's Affirmative Action Office has the responsibility of monitoring the progress of METRO's DBE Program. At a minimum, this record-keeping system identifies and assesses DBE contract awards, prime contractors' progress in achieving DBE subcontract goals, and other DBE affirmative action efforts. Specifically, METRO maintains records showing:

1.  Procedures which have been adopted to comply with DOT/UMTA and METRO requirements;

2.  Awards to DBEs, including names of contractors and subcontractors, nature of the work/services to be performed, and the percentage of DBE participation per contract. To assist in this effort, METRO will obtain regular reports from prime contractors on their progress in meeting contractual DBE obligations;

3.  Specific efforts to identify and award contracts to DBEs;

4.  Copies of direct mailings to disadvantaged businesses;

5.  Pre-bid conference information as it relates to METRO's DBE provisions;

6.  Requests for assistance from disadvantaged businesses interested in bidding/proposing on METRO contracts and subcontracts;

7.  Workshops, seminars and training programs conducted for disadvantaged businesses; and

8.  Efforts to assist DBEs in acquiring bonding and insurance.

METRO's Affirmative Action Office will submit at least quarterly DBE reports to the METRO Board as well as reports conforming in frequency and format to UMTA contract reporting requirements. These reports shall include as a minimum:

1.  The number of contracts awarded to DBEs;

2.  A description of the general categories of contracts awarded to DBEs;

3. The dollar value of contracts awarded to DBEs;

4. The percentage of the dollar value of all contracts awarded to DBEs during the preceding quarter; and

5. An indication of whether or not and the extent of which the percentage met or exceeded the DBE goals specified per contract.

Information concerning contractors that are not disadvantaged will be recorded and reported separately.

IX.

## DBE DIRECTORY

METRO's DBE Directory is a detailed listing of over 1,000 businesses and is categorized by types of firms to facilitate identifying businesses with capabilities relevant to a particular specification. Each business listing contains the business name, contact person, address, phone number, legal structure of the business, and details concerning the company's business specialty(ies). Standard Industrial Classification (SIC) Codes are identified for each company. The directory is continuously updated and maintained on the computer and on hard copy.

In compiling this directory, METRO makes intensive efforts to identify and certify as many disadvantaged businesses as possible that have the potential of doing business with METRO. To this end, a list is compiled that includes names of firms from minority and women's organizations along with information provided by the Texas Industrial Commission, Houston Business Council, City of Houston, the Small Business Administration, minority business development agencies, National Association of Women Business Owners, and other transit authorities.

METRO will maintain and have available an updated DBE Directory and source list(s) per bid/proposal solicitation to facilitate identifying DBEs with capabilities relevant to general contracting requirements and to particular solicitations. METRO will make the directory and source list(s) available to bidders and proposers in their efforts to meet the DBE requirements. Further, METRO shall specify which firms the DOT, METRO, or the Small Business Administration has determined to be eligible DBEs in accordance with procedures set forth in 49 CFR Part 23, as amended.

A copy of METRO's current DBE Directory may be obtained by contacting the Affirmative Action Office.

X.

## "SET-ASIDE" PROGRAM

A set-aside is a procurement technique which limits consideration of bids or proposals to those submitted by DBEs in cases where DBEs with capabilities consistent with contract requirements exist in sufficient number to permit competition. Because proposals and bids will be considered only if received from DBEs, there is an assurance that such a firm will receive the contract.

The designation of contracts to be set-aside must be based on the known capabilities of firms to compete, thereby insuring that a qualified firm will be found and increasing the possibility for competition among eligible firms. Thus, when properly undertaken, set-asides will insure a certain level of DBE participation in procurement activities.

Utilization of DBE set-side programs by METRO will be reviewed if METRO is unable to attain its DBE goals and in cases where at least three DBEs with capabilities consistent with contract requirements exist so as to permit competition.

# XI.

## EXHIBITS

(iii)      Asian and Pacific Islander (all persons having origins in any of the original people of the Far East, Southeast Asia, the Indian subcontinent, or the Pacific Islands); and

(iv)      American Indian or Alaskan native (all persons having origins in any of the original people of North America and maintaining identifiable tribal affiliations through membership and participation or community identification);

(e)   METRO means the Metropolitan Transit Authority; and

(f)   "Administering Agency" means the Department of Transportation, Urban Mass Transportation Administration.

2.    Whenever the Contractor, or any subcontractor at any tier, subcontracts a portion of the work involving any construction trade, it shall physically include <u>in each subcontract in excess of $10,000</u> the provisions of these specifications and the Notice which contains the applicable goals for minority and female participation and which is set forth in the solicitations from which this contract resulted.

3.    If the Contractor is participating (pursuant to 41 CFR 60-4.5) in a Hometown Plan approved by the U.S. Department of Labor in the covered area either individually or through an association, its affirmative action obligations on all work in the Plan area (including goals and timetables) shall be in accordance with that Plan for those trades which have unions participating in the Plan. Contractors must be able to demonstrate their participation in and compliance with the provisions of any such Hometown Plan. Each contractor or subcontractor participating in an approved Plan is individually required to comply with its obligations under the EEO clause, and to make a good faith effort to achieve each goal under the EEO clause, and to make a good faith effort to achieve each goal under the Plan in each trade in which it has employees. The overall good faith performance by other Contractors or subcontractors toward a goal in an approved Plan does not excuse any covered Contractor's or subcontractor's failure to take good faith efforts to achieve the Plan goals and timetables.

4.    The Contractor shall implement the specific affirmative action standards provided in paragraphs 7 (a) through (p) of these specifications. The goals set forth in the solicitation from which this contract resulted are

expressed as percentages of the total hours of employment and training of minority and female utilization the Contractor should reasonably be able to achieve in each construction trade in which it has employees in the covered area. Covered construction contractors performing construction work in geographical areas where they do not have a federal or federally assisted construction contract shall apply the minority and female goals established for the geographical area where the work is being performed. Goals are published periodically in the Federal Register in notice form, and such notices may be obtained from any office of Federal Contract Compliance Program Office or from Federal Procurement Contracting Officers. The Contractor is expected to make substantially uniform progress toward its goal in each craft during the period specified.

5.  Neither the provisions of any collective bargaining agreement, nor the failure by a union with whom the Contractor has a collective bargaining agreement, to refer either minorities or women shall excuse the Contractor's obligations under these specifications, Executive Order 11246, or the regulations promulgated pursuant thereto, or METRO policy.

6.  In order for the non-working training hours of apprentices and trainees to be counted in meeting the goals, such apprentices and trainees must be employed by the Contractor during the training period, and the Contractor must have made a commitment to employ the apprentices and trainees at the completion of their training, subject to the availability of employment opportunities. Trainees must be trained pursuant to training programs approved by the U.S. Department of Labor.

7.  The Contractor shall take specific affirmative actions to ensure equal employment opportunity. The evaluation of the Contractor's compliance with these specifications shall be based upon its effort to achieve maximum results from its actions. The Contractor shall document these efforts fully, and shall implement affirmative action steps at least as extensive as the following:

    (a)  Ensure and maintain a working environment free of harassment, intimidation, and coercion at all sites, and in all facilities at which the Contractor's employees are assigned to work. The Contractor, where possible, will assign two or more women to each

CHIPDF - www.fasoo.com

construction project. The Contractor shall specifically ensure that all foremen, superintendents, and other on-site supervisory personnel are aware of and carry out the Contractor's obligation to maintain such a working environment, with specific attention to minority or female individuals working at such sites or in such facilities.

(b) Establish and maintain a current list of minority and female recruitment sources and community organizations when the Contractor or its unions have employment opportunities available, and maintain a record of the organizations.

(c) Maintain a current file of the names, addresses and telephone numbers of each minority and female off-the-street applicant and minority or female referral from a union, a recruitment source or community organization and of what action was taken with respect to each such individual. If such individual was sent to the union hiring hall for referral and was not referred back to the Contractor by the union, if referred, not employed by the Contractor, this shall be documented in the file with the reason therefor, along with whatever additional actions the Contractor may have taken.

(d) Provide immediate written notification to METRO's Assistant to the General Manager for Affirmative Action and OFCCP's Director when the union or unions with which the Contractor has a collective bargaining agreement has not referred to the Contractor a minority person or woman sent by the Contractor, or when the Contractor has other information that the union referral process has impeded the Contractor's efforts to meet its obligations.

(e) Develop on-the-job training opportunities and/or participate in training programs for the area which expressly include minorities and women, including upgrading programs and apprenticeship and trainee programs relevant to the Contractor's employment needs especially those programs funded or approved by the Department of Labor. The Contractor shall provide notice of these programs to the sources compiled under 7 (b) above.

(f) Disseminate the Contractor's EEO policy by providing notice of the policy to unions and training programs and requesting their cooperation in assisting the Contractor in meeting its EEO obligations; by

including it in any policy manual and company newspaper, annual report, etc.; by specific review of the policy with all management personnel and with all minority and female employees at least once a year; and by posting the company EEO policy on bulletin boards accessible to all employees at each location where construction work is performed.

(g) Review, at least annually, the company's EEO policy and affirmative action obligations under these specifications with all employees having any responsibility for hiring, assignment, layoff, termination or other employment decisions including specific review of these items with onsite supervisory personnel such as superintendents, general foremen, etc., prior to the initiation of construction work at any job site. A written record shall be made and maintained in identifying the time and place of these meetings, persons attending, subject matter discussed, and disposition of the subject matter.

(h) Disseminate the Contractor's EEO policy externally by including it in any advertising in the news media, specifically including minority and female news media, and providing written notification to and discussing the Contractor's EEO policy with other contractors and subcontractors with whom the Contractor does or anticipates doing business.

(i) Direct its recruitment efforts, both oral and written, to minority, female and community organization, to schools with minority and female students, and to minority and female recruitment and training organizations serving the Contractor's recruitment area and employment needs. Not later than one month prior to the date for the acceptance of applications for apprenticeship or other training by any recruitment source, the Contractor shall send written notification to organizations such as the above, describing the openings, screening procedures, and tests to be used in the selection process.

(j) Encourage present minority and female employees to recruit other minority persons and women and, where possible, provide after school, summer and vacation employment to minority and female youth both on the site and in other areas of Contractor's workforce.

(k) Validate all tests and other selection requirements where there is an obligation to do so under 41 CFR 60-3.

(1)   Conduct, at least annually, an inventory and evaluation at least of all minority and female personnel for promotional opportunities and encourage these employees to seek or prepare for, through appropriate training, etc., such opportunities.

(m)   Ensure that seniority practices, job classifications, work assignments and other personnel practices, do not have a discriminatory effect by continually monitoring all personnel and employment related activities to ensure that the EEO policy and the Contractor's obligations under these specifications are being carried out.

(n)   Ensure that all facilities and company activities are nonsegregated except that separate or single-user toilet and necessary changing facilities shall be provided to assure privacy between the sexes.

(o)   Document and maintain a record of all solicitations of offers for subcontracts from minority and female construction contractors and suppliers, including circulation of solicitations to minority and female contractor associations and other business associations.

(p)   Conduct a review, at least annually, of all supervisors' adherence to and performance under the Contractor's EEO policies and affirmative action obligations.

8.   Contractors are encouraged to participate in voluntary associations which assist in fulfilling one or more of their affirmative action obligations [7 (a) through (p)]. The efforts of a contractor association, joint contractor-union, contractor-community, or other similar group of which the Contractor is a member and participant, may be asserted as fulfilling any one or more of its obligations under 7 (a) through (p) of these specifications provided that the Contractor actively participates in the group, makes every effort to assure that the group has a positive impact on the employment of minorities and women in the industry, ensures that the concrete benefits of the program are reflected in the Contractor's minority and female workforce participation, makes a good faith effort to meet its individual goals and timetables, and can provide access to documentation which demonstrates the effectiveness of actions taken on behalf of the Contractor. The obligation to comply, however, is the Contractor's and failure of such a group to fulfill an obligation shall not be a defense for the Contractor's noncompliance.

CHXPDF - www.fxsio.com

9.    A single goal for minorities and a separate single goal for women have been established. The Contractor, however, is required to provide equal employment opportunity and to take affirmative action for all minority groups, both male and female, and all women, both minority and non-minority. Consequently, the Contractor may be in violation of Executive Order 11246 if a particular group is employed in a substantially disparate manner (for example, even though the Contractor has achieved its goals for women generally, the Contractor may be in violation of Executive Order 11246 if a specific minority group of women is underutilized.

10.   The Contractor shall not use the goals and timetables or affirmative action standards to discriminate against any person because of race, color, religion, sex, or national origin.

11.   The Contractor shall not enter into any subcontract with any person or firm debarred from government contracts pursuant to Executive Order 11246.

12.   The Contractor shall carry out such sanctions and penalties for violation of these specifications and of the Equal Opportunity Clause, including suspension, termination and cancellation of existing subcontracts as may be imposed or ordered pursuant to Executive Order 11246, as amended, and its implementing regulations by the Office of Federal Contract Compliance Programs. Any Contractor who fails to carry out such sanctions and penalties shall be in violation of these specifications and Executive Order 11246, as amended.

13.   The Contractor, in fulfilling its obligations under these specifications, shall implement specific affirmative action steps, at least as extensive as those standards prescribed in paragraph (7) of these specifications, so as to achieve maximum results from this effort to ensure equal employment opportunity. If the Contractor fails to comply with the requirements of Executive Order 11246, the implementing regulations, or these specifications, the Director shall proceed in accordance with 41 CFR 60-4.8.

14.   The Contractor shall designate a responsible official to monitor all employment related activity to ensure that the company EEO policy is being carried out, to submit reports relating to the provisions hereof as required by METRO in paragraph (16) below and as may be required by the government, and to keep records. Records shall at least include for each employee the name, address, telephone numbers, construction trade, union affiliation if any,

employee identification number when assigned, social security number, race, sex, status (e.g., mechanic, apprentice, trainee, helper, or laborer), dates of changes in status, hours worked per week in the indicated trade, rate of pay, and locations at which the work was performed. Records shall be maintained in an easily understandable and retrievable form; however, to the degree that existing records satisfy this requirement, Contractor shall not be required to maintain separate records.

15. Nothing herein provided shall be construed as a limitation upon the application of other laws which establish different standards of compliance or upon the application of requirements for the hiring of local or other area residents (e.g., those under the Public Works Employment Act of 1977 and the Community Development Block Grant Program). Similarly, nothing herein shall be interpreted to diminish the responsibilities of METRO nor the obligations of Contractors or subcontractors pursuant to Executive Order 11246 and METRO policy.

16. The Contractor, as well as subcontractors, shall submit monthly reports on minority employment to METRO by the fifth day of each month, using applicable forms available from METRO's Assistant to the General Manager for Affirmative Action. Copies of these monthly reports shall also be submitted to the OFCCP, Houston Area Office, by the due date noted above and as directed by METRO's Assistant to the General Manager for Affirmative Action. If the Contractor or subcontractor is unable to submit his report on time, he shall notify METRO and request additional time. Failure of the Contractor to report in a timely manner may result in a finding of non-compliance.

17. The Contractor and subcontractors shall permit access to their books, records, and accounts by OFCCP, the Office of Civil Rights of the Urban Mass Transportation Administration and by METRO's Assistant to the General Manager for Affirmative Action or a designated representative for the purpose of investigation to ascertain compliance with the foregoing requirements.

C. Notice of Requirement for Affirmative Action to Ensure Equal Employment Opportunity Pursuant to Executive Order 11246.

1. Nondiscrimination. Pursuant to 41 C.F.R. § 60-1.4 (b)(1) and (c). DURING THE PERFORMANCE OF THIS CONTRACT, THE CONTRACTOR AGREES AS FOLLOWS:

(a)     THE CONTRACTOR WILL NOT DISCRIMINATE AGAINST ANY
        EMPLOYEE OR APPLICANT FOR EMPLOYMENT BECAUSE OF RACE,
        COLOR, RELIGION, SEX, OR NATIONAL ORIGIN. THE
        CONTRACTOR WILL TAKE AFFIRMATIVE ACTION TO ENSURE THAT
        APPLICANTS ARE EMPLOYED, AND THAT EMPLOYEES ARE
        TREATED DURING EMPLOYMENT WITHOUT REGARD TO THEIR
        RACE, COLOR, RELIGION, SEX, OR NATIONAL ORIGIN. SUCH
        ACTION SHALL INCLUDE, BUT NOT BE LIMITED TO THE
        FOLLOWING: EMPLOYMENT, UPGRADING, DEMOTION, OR
        TRANSFER: RECRUITMENT OR RECRUITMENT ADVERTISING:
        LAYOFF OR TERMINATION: RATES OF PAY OR OTHER FORMS OF
        COMPENSATION: AND SELECTION FOR TRAINING, INCLUDING
        APPRENTICESHIP. THE CONTRACTOR AGREES TO POST IN
        CONSPICUOUS PLACES, AVAILABLE TO EMPLOYEES AND
        APPLICANTS FOR EMPLOYMENT, NOTICES TO BE PROVIDED
        SETTING FORTH THE PROVISIONS OF THIS NONDISCRIMINATION
        CLAUSE.

(b)     THE CONTRACTOR WILL, IN ALL SOLICITATIONS OR
        ADVERTISEMENTS FOR EMPLOYEES PLACED BY OR ON BEHALF OF
        THE CONTRACTOR, STATE THAT ALL QUALIFIED APPLICANTS
        WILL RECEIVE CONSIDERATION FOR EMPLOYMENT WITHOUT
        REGARD TO RACE, COLOR, RELIGION, SEX, OR NATIONAL
        ORIGIN.

(c)     THE CONTRACTOR WILL SEND TO EACH LABOR UNION OR
        REPRESENTATIVE OF WORKERS WITH WHICH HE HAS A
        COLLECTIVE BARGAINING AGREEMENT OR OTHER CONTRACT OR
        UNDERSTANDING, A NOTICE TO BE PROVIDED ADVISING THE
        SAID LABOR UNION OR WORKERS' REPRESENTATIVES OF THE
        CONTRACTOR'S COMMITMENTS UNDER THIS SECTION 202 OF
        EXECUTIVE ORDER 11246 OF SEPTEMBER 24, 1965, AND SHALL
        POST COPIES OF THE NOTICE IN CONSPICUOUS PLACES
        AVAILABLE TO EMPLOYEES AND APPLICANTS FOR EMPLOYMENT.

(d)     THE CONTRACTOR WILL COMPLY WITH ALL PROVISIONS OF
        EXECUTIVE ORDER 11246 OF SEPTEMBER 24, 1965, AND OF
        THE RULES, REGULATIONS, AND RELEVANT ORDERS OF THE
        SECRETARY OF LABOR.

(e)     THE CONTRACTOR WILL FURNISH ALL INFORMATION AND
        REPORTS REQUIRED BY EXECUTIVE ORDER 11246 OF
        SEPTEMBER 24, 1965, AND BY RULES, REGULATIONS, AND
        ORDERS OF THE SECRETARY OF LABOR, OR PURSUANT THERETO,
        AND WILL PERMIT ACCESS TO HIS BOOKS, RECORDS, AND
        ACCOUNTS BY THE URBAN MASS TRANSPORTATION
        ADMINISTRATION AND THE SECRETARY OF LABOR FOR PURPOSES
        OF INVESTIGATION TO ASCERTAIN COMPLIANCE WITH SUCH
        RULES, REGULATIONS, AND ORDERS.

(f)     IN THE EVENT OF THE CONTRACTOR'S NONCOMPLIANCE WITH THE NONDISCRIMINATION CLAUSES OF THIS AGREEMENT OR WITH ANY OF THE SAID RULES, REGULATIONS OR ORDERS, THIS AGREEMENT MAY BE CANCELLED, TERMINATED, OR SUSPENDED IN WHOLE OR IN PART AND THE CONTRACTOR MAY BE DECLARED INELIGIBLE FOR FURTHER GOVERNMENT CONTRACTS OR FEDERALLY ASSISTED CONSTRUCTION CONTRACTS IN ACCORDANCE WITH PROCEDURES AUTHORIZED IN EXECUTIVE ORDER 11246 OF SEPTEMBER 24, 1965, AS AMENDED, AND SUCH OTHER SANCTIONS MAY BE IMPOSED AND REMEDIES INVOKED AS PROVIDED IN EXECUTIVE ORDER 11246 OF SEPTEMBER 24, 1965, OR BY RULE, REGULATION, OR ORDER OF THE SECRETARY OF LABOR, OR AS OTHERWISE PROVIDED BY LAW.

(g)     THE CONTRACTOR WILL INCLUDE A CITATION TO 41 C.F.R. § 60-1.4(b)(1) AND (c) AND THE PROVISIONS OF PARAGRAPHS (a) THROUGH (g) IN EVERY SUBCONTRACT OR PURCHASE ORDER UNLESS EXEMPTED BY RULES, REGULATIONS, OR ORDERS OF THE SECRETARY OF LABOR ISSUED PURSUANT TO SECTION 204 OF EXECUTIVE ORDER 11246 OF SEPTEMBER 24, 1965, SO THAT SUCH PROVISIONS SHALL BE BINDING UPON EACH SUBCONTRACTOR OR VENDOR.   THE CONTRACTOR WILL TAKE SUCH ACTION WITH RESPECT TO ANY SUBCONTRACT OR PURCHASE ORDER AS THE URBAN MASS TRANSPORTATION ADMINISTRATION MAY DIRECT AS A MEANS OF ENFORCING SUCH PROVISIONS, INCLUDING SANCTIONS FOR NONCOMPLIANCE: PROVIDED, HOWEVER, THAT IN THE EVENT A CONTRACTOR BECOMES INVOLVED IN, OR IS THREATENED WITH, LITIGATION WITH A SUBCONTRACTOR OR VENDOR AS A RESULT OF SUCH DIRECTION BY THE URBAN MASS TRANSPORTATION ADMINISTRATION, THE CONTRACTOR MAY REQUEST THE UNITED STATES TO ENTER INTO SUCH LITIGATION TO PROTECT THE INTERESTS OF THE UNITED STATES.

2.     The bidder's attention is called to the "Standard Federal Equal Employment Opportunity Construction Contract Specifications" (Part I.C.) and the "Equal Opportunity Clause" (Part I.A.) set forth herein.

3.     The goals and timetables for minority and female participation, expressed in percentage terms for the Contractor's aggregate workforce in each trade on all construction work in the Houston SMSA area, are as follows:

| Timetables | Goals for Minority Participation for Each Trade | Goals for Female Participation for Each Trade |
|---|---|---|
| Until further notice by OFCCP | 27.3% | 6.9% |

7/001/269/3                          - 63 -                          2/19/90

These goals are applicable to all the Contractor's construction work (whether or not it is Federal or Federally assisted) performed in the Houston SMSA area.

The Contractor's compliance with the Executive Order and the regulations in 41 CFR Part 60-4, and METRO Policy shall be based on its implementation of the equal opportunity clause, specific affirmative action obligations required by the specifications set forth in 41 CFR 60-4.3(a), and its efforts to meet the goals established for the Houston SMSA area where the contract resulting from this solicitation is to be performed. The hours of minority and female employment and training must be substantially uniform throughout the length of the contract, and in each trade, and the Contractor shall make a good faith effort to employ minorities and women evenly on each of its projects. The transfer of minority or female employees or trainees from contractor to contractor or from project to project for the sole purpose of meeting the Contractor's goals shall be a violation of the contract, the Executive Order and the regulations in 41 CFR Part 60-4, and METRO policy. Compliance with the goals will be measured against the total work hours performed.

4. The Contractor shall provide written notification to METRO's Assistant to the General Manager for Affirmative Action and the Director of the Office of Federal Contract Compliance Programs within 10 working days of award of any construction subcontract in excess of $10,000 at any tier for construction work under the contract resulting from this solicitation. The notification shall list the name, address and telephone number of the subcontractor; employer identification number; estimated dollar amount of the subcontract; estimated starting and completion dates of the subcontract; and the geographical area in which the contract is to be performed.

5. As used in this Notice, and in the contract resulting from this solicitation, the "covered area" is the Houston, Harris County, Texas, SMSA.

D. Labor Provisions: Pursuant to regulations set forth at 29 CFR Part 5 the following provisions shall be incorporated in all construction contracts of $2,000 let by METRO in carving out the project.

Case 4:93-cv-03651  Document 1  Filed in TXSD on 11/16/93  Page 80 of 106

1.    <u>Minimum Wages</u>.

(a)    All mechanics and laborers employed or working upon the site of the work, will be paid unconditionally and not less often than once a week, and without subsequent deduction or rebate on any account (except such payroll deductions as are permitted by regulations issued by the Secretary of Labor under the Copeland Act (29 CFR, Part 3), the full amounts due at the time of payment computed at wage rates not less than those contained in the wage determination decision of the Secretary of Labor which wage determination decision is attached hereto and made a part hereof, regardless of any contractual relationship which may be alleged to exist between the Contractor and such laborers and mechanics; and the wage determination decision shall be posted by the Contractor at the site of the work in a prominent place where it can be easily seen by the workers. For the purpose of this clause, contributions made or costs reasonably anticipated under Section 1(b)(2) of the Davis-Bacon Act, 40 U.S.C., Section 276a(b)(2), on behalf of laborers or mechanics are considered wages paid to such laborers or mechanics, subject to the provisions of 29 CFR 5.5(a)(1)(iv). Also for the purpose of this clause, regular contributions made or costs incurred for more than a weekly period under plans, funds, or programs, but covering the particular weekly period, are deemed to be constructively made or incurred during such weekly period.

(b)    The contracting officer shall require that any class of laborers or mechanics, including apprentices and trainees, which is not listed in the wage determination and which is to be employed under the contract, shall be classified or reclassified conformably to the wage determination, and a report of the action taken shall be sent by the Department of Transportation (DOT) to the Secretary of Labor. In the event the interested parties cannot agree on the proper classifications or reclassification of a particular class of laborers and mechanics, including apprentices and trainees, to be used, the question, accompanied by the recommendation of the contracting officer shall be referred to the Secretary of Labor for final determination.

CIMPDF - www.fasoo.com

(c)     The contracting officer shall require, whenever the minimum wage rate prescribed in the contract for a class of laborers or mechanics includes a fringe benefit which is not expressed as an hourly wage rate and the Contractor is obligated to pay a cash equivalent of such a fringe benefit, an hourly cash equivalent thereof to be established. In the event the interested parties cannot agree upon a cash equivalent of the fringe benefit, the question, accompanied by the recommendation of the contracting officer, shall be referred to the Secretary of Labor for determination.

(d)     If the Contractor does not make payments to a trustee or other third person, he may consider as part of the wages of any laborer or mechanic the amount of any costs reasonably anticipated in providing benefits under a plan or program of a type expressly listed in the wage determination decision of the Secretary of Labor which is a part of this contract; provided, however, the Secretary of Labor has found, upon written request of the Contractor, that the applicable standards of the Davis-Bacon Act have been met. The Secretary of Labor may require the Contractor to set aside in a separate account assets for the meeting of obligations under the plan or program.

2.     Withholding. DOT may withhold or cause to be withheld from the Contractor so much of the accrued payments of advances as may be considered necessary to pay laborers and mechanics, including apprentices and trainees, employed by the Contractor or any subcontractor on the work the full amount of wages required by the contract. In the event of failure to pay any laborer or mechanic, including any apprentice or trainee, employed or working on the site of the work, all or part of the wages required by the contract, DOT may, after written notice to the Contractor, sponsor, applicant, or owner, take such action as may be necessary to cause the suspension of any further payment, advance, or guarantee of funds until such violations have ceased.

3.     Payroll and Basic Records.

(a)     Payrolls and basic records relating thereto will be maintained during the course of the work and preserved for a period of three years thereafter for all laborers and mechanics working at the site of the work, in the construction or development of the

project. Such records will contain the name and address of each such employee, his correct classification, rates of pay (including rates of contributions or costs anticipated of the types described in Section 1(b)(2) of the Davis-Bacon Act), daily and weekly number of hours worked, deductions made and actual wages paid. Whenever the Secretary of Labor has found under 29 CFR 5.5(a)(1)(iv) that the wages of any laborers or mechanics include the amount of any costs reasonably anticipated in providing benefits under a plan or program described in Section 1(b)(2)(B) of the Davis-Bacon Act, the Contractor shall maintain records which show that the commitment to provide such benefits is enforceable, and that the plan or program is financially responsible, and that the plan or program has been communicated in writing to the laborers or mechanics affected, and records which show the costs anticipated or the actual cost incurred in providing such benefits.

(b)    The Contractor will submit weekly a copy of all payrolls to METRO for transmittal to DOT. The copy shall be accompanied by a statement signed by the employer or his agent indicating that the payrolls are correct and complete, that the wage rates contained therein are not less than those determined by the Secretary of Labor and that the classifications set forth for each laborer or mechanic conform to the work to be performed. A submission of the "Weekly Statement of Compliance" which is required under this contract and the Copeland Regulations of the Secretary of Labor (29 CFR Part 3) and the filing with the initial payroll or any subsequent payroll of a copy of any findings by the Secretary of Labor under 29 CFR 5.5(a) (1)(iv) shall satisfy this requirement. The prime contractor shall be responsible for the submission of copies of payrolls of all subcontractors. The Contractor will make the records required under the labor standards clause of the contract available for inspection by authorized representatives of DOT and the Department of Labor, and will permit such representatives to interview employees during working hours on the job. Contractors employing apprentices or trainees under approved programs shall include a notation on the first weekly certified payrolls submitted to the contracting agencies that their employment is pursuant to an approved program and shall identify the program.

4. Apprentices and Trainees.

    (a) <u>Apprentices</u>. Apprentices will be permitted to work at less than the predetermined rate for the work they performed when they are employed and individually registered in a bona fide apprenticeship program registered with the U.S. Department of Labor. Employment and Training Administration, Bureau of Apprenticeship and Training or with a state apprenticeship agency recognized by the Bureau, or if a person is employed in his first 90 days of probationary employment as an apprentice in such an apprenticeship program, who is not individually registered in the program, but who has been certified by the Bureau of Apprenticeship and Training or a state apprenticeship agency (where appropriate) to be eligible for probationary employment as an apprentice. The allowable ratio of apprentices to journeyman in any craft classification shall not be greater than the ratio permitted to the Contractor as to his entire work force under the registered program. Any employee listed on a payroll at an apprentice wage rate, who is not a trainee as defined in subdivision (b) of this subparagraph or is not registered or otherwise employed as stated above, shall be paid the wage rate determined by the Secretary of Labor for the classification of work he actually performed. The Contractor or subcontractor will be required to furnish to the contracting officer or a representative of the Wage-Hour Division of the U.S. Department of Labor written evidence of the registration of his program and apprentices as well as the appropriate ratios and wage rates (expressed in percentages of the journeymen hourly rates) for the area of construction prior to using any apprentices on the contract work. The wage rate paid apprentices shall not be less than the appropriate percentage of the journeyman's rate contained in the applicable wage determination.

    (b) <u>Trainees</u>. Except as provided in 29 CFR 5.15, trainees will not be permitted to work at less than the predetermined rate for the work performed unless they are employed pursuant to or individually registered in a program which has received prior approval, evidenced by formal certification, by the U.S. Department of Labor, Employment and Training Administration, Bureau of Apprenticeship and Training. The ratio of trainees

to journeymen shall not be greater than that permitted under the plan approved by the Bureau of Apprenticeship and Training. Every trainee must be paid at not less than the rate specified in the approved program for his level of progress. Any employee listed on the payroll at a trainee rate who is not registered and participating in a training plan approved by the Bureau of Apprenticeship and Training shall be paid not less than the wage rate determined by the Secretary of Labor for the classification of work he actually performed. The Contractor or subcontractor will be required to furnish the contracting officer or a representative of the Wage-Hour Division of the U.S. Department of Labor written evidence of the certification of his program, the registration of the trainees, and the ratios and wage rates prescribed in that program. In the event the Bureau of Apprenticeship and Training withdraws approval of a training program, the Contractor will no longer be permitted to utilize trainees at less than the applicable predetermined rate for the work performed until an acceptable program is approved.

(c) <u>Equal Employment Opportunity</u>. The utilization of apprentices, trainees and journeymen under this part shall be in conformity with the equal employment opportunity requirements of Executive Order 11246, as amended, and 29 CFR Part 30.

5. <u>Compliance with Copeland Regulations (29 CFR Part 3)</u>. The Contractor shall comply with the Copeland Regulations (29 CFR Part 3) of the Secretary of Labor which are herein incorporated by reference.

6. <u>Contract Termination; Debarment</u>. A breach of clauses (1) through (9) and (14) may be grounds for termination of the contract, and for debarment as provided in 29 CFR 5.6.

7. <u>Overtime Requirements</u>. No Contractor or subcontractor contracting for any part of the contract work which may require or involve the employment of laborers or mechanics shall require or permit any laborer or mechanic in any workweek in which he is employed on such work to work in excess of eight hours in any calendar day or in excess of forty hours in such workweek unless such laborer or mechanic receives compensation at a rate not less than one and one-half times his basic rate of pay for all hours worked in excess of eight hours in any calendar day or in excess of forty hours in such workweek, as the case may be.

8.  <u>Violation: Liability for Unpaid Wages: Liquidated Damages</u>. In the event of any violation of the clause set forth in subparagraph (7), the Contractor and any subcontractor responsible therefor shall be liable to any affected employee for his unpaid wages. In addition, such Contractor and subcontractor shall be liable to the United States (in the case of work done under contract for the District of Columbia or a territory, to such district or to such territory), for liquidated damages. Such liquidated damages shall be computed with respect to each individual laborer or mechanic employed in violation of the clause set forth in subparagraph (7), in the sum of $10 for each calendar day on which such employee is required or permitted to work in excess of eight hours or in excess of the standard workweek of forty hours without payment of the overtime wages required by the clause set forth in subparagraph (7).

9.  <u>Withholding for Liquidated Damages</u>. DOT may withhold or cause to be withheld, from any money payable on account of work performed by the Contractor or subcontractor, such sums as may administratively be determined to be necessary to satisfy any liabilities of such Contractor or subcontractor for unpaid wages and liquidated damages as provided in the clause set forth in subparagraph (8).

10. <u>Final Labor Summary</u>. The Contractor and each subcontractor shall furnish to the recipient, upon the completion of the contract, a summary of all employment, indicating, for the completed project, the total hours worked and the total amount earned.

11. <u>Final Certification</u>. Upon completion of the contract, the Contractor shall submit to the recipient with the voucher for final payment for any work performed under the contract a certificate concerning wages and classifications for laborers mechanics, including apprentices and trainees employed on the project, in the following form:

THE UNDERSIGNED, CONTRACTOR ON

_____

(CONTRACT NO.)

Hereby certifies that all laborers, mechanics, apprentices, and trainees employed by him or by a subcontractor performing work under the contract on the project have been

paid wages at rates not less than those required by the contract provisions, and that the work performed by each such laborer, mechanic, apprentice or trainee conformed to the classifications set forth in the contract or training program provisions applicable to the wage rate paid.

SIGNATURE AND TITLE_____

12.   Notice to the Recipient of Labor Disputes.   Whenever   the Contractor has acknowledged that any actual or potential labor dispute is delaying or threatens to delay the timely performance   of   this   contract,   the   Contractor   shall immediately give notice thereof, including all relevant information with respect thereto, to the recipient.

13.   Dispute Clause.

      (a)   All disputes concerning the payment of prevailing wage rates or classifications shall be promptly reported to the recipient for its referral to DOT for decision or, at the option of DOT, DOT referral to the Secretary of Labor.   The decision of DOT or the Secretary of Labor, as the case may be, shall be final.

      (b)   All   questions   relating   to   the   application   or interpretation of the Copeland Act, 40 U.S.C. Section 276c, the contract work hours and Safety Standards Act, 40 U.S.C. Sections 327-333, the Davis-Bacon Act, 40 U.S.C. Section 276A, or Section 13 of the Urban Mass Transportation Act, 49 U.S.C. Section 1609, shall be sent to UMTA for referral to the Secretary of Labor for ruling or interpretation, and such ruling or interpretation shall be final.

14.   Insertion in Subcontract.   The Contractor shall insert in any subcontracts the clauses set forth in subsections (1) through (14) of this section and also a clause requiring the subcontractors to include these clauses in any lower tier subcontracts which they may enter into, together with a   clause   requiring   this   insertion   in   any   further subcontracts that may in turn be made and such other clauses as the government may by appropriate instructions require.

PART II - UTILIZATION OF DISADVANTAGED BUSINESS ENTERPRISES

A.   DOT/UMTA Disadvantaged Business Policy.

1.   It is the policy of the Department of Transportation (DOT) that disadvantaged and women-owned business enterprises as in 49 CFR, Part 23 as amended, shall have the maximum opportunity to participate in the performance of contracts financed in whole or in part with federal funds under this contract.

2.   The Contractor agrees to ensure that DBEs as defined in 49 CFR Part 23 have the maximum opportunity to participate in the performance of contracts and subcontracts financed in whole or in part with federal funds provided under this contract.   In this regard, all contractors shall take all necessary and reasonable steps in accordance with 49 CFR Part 23 as amended to ensure that DBEs have the maximum opportunity to compete and perform on this project.   The Contractor and subcontractors shall not discriminate on the basis of race, color, national origin or sex in the award and performance of DOT-assisted contracts.

3.   Failure of the Contractor to carry out the requirements of the DBE specifications shall constitute a breach of contract, may result in termination of the contract or agreement by METRO or such remedy as METRO deems appropriate.   The Contractor shall use its best efforts to carry out the DBE policy consistent with efficient performance on the project.

4.   Bidders are hereby informed that METRO has established goals for the participation of DBEs under this contract. Since subcontractor awards by the successful bidder on this solicitation to DBE firms and disadvantaged-majority joint ventures are crucial to the achievement of METRO DBE goals, this specification includes requirements with which bidders must comply.

5.   Definitions of DBEs

The term "Disadvantaged Business" means a small business concern owned and controlled by socially and economically disadvantaged individuals.   For the purpose of this definition "socially and economically disadvantaged small business concern" means any small business concern:

(a) which is at least 51 percent owned by one or more socially and economically disadvantaged individuals; or, in the case of any publicly owned business, at least 51 percent of the stock which is owned by one or more socially and economically disadvantaged individuals; and

(b) whose management and daily business operations are controlled by one or more of the socially and economically disadvantaged individuals who own it.

"Small business concern" means a small business as defined pursuant to Section 3 of the Small Business Act and relevant regulations promulgated pursuant thereto except that a small business concern shall not include any concern or group of concerns controlled by the same socially and economically disadvantaged individual or individuals which has annual average gross receipts in excess of $14 million over the previous three fiscal years. The Secretary shall adjust this figure from time to time for inflation.

METRO hereby makes a rebuttable presumption that individuals in the following groups are socially and economically disadvantaged and reserves the right to determine, on a case-by-case basis, that individuals who are not members of one of the following groups are socially and economically disadvantaged:

(a) "Black Americans", which includes persons having origins in any of the Black racial groups of Africa;

(b) "Hispanic Americans", which includes persons of Mexican, Puerto Rican, Cuban, Central or South American, or other Spanish or Portuguese culture or origin, regardless of race;

(c) "Native Americans", which includes persons who are American Indians, Eskimos, Aleuts, or Native Hawaiians;

(d) "Asian-Pacific Americans", which includes persons whose origins are from Japan, China, Taiwan, Korea, Vietnam, Laos, Cambodia, the Philippines, Samoa, Guam, the U.S. Trust Territories of the Pacific, and the Northern Marianas; and

(e) "Asian-Indian Americans", which includes persons whose origins are from India, Pakistan, and Bangladesh.

(f) Women, and

(g) any other minorities or individuals found to be disadvantaged by the Small Business Administration pursuant to Section 8(a) of the Small Business Act.

Only citizens of the United states (or lawfully admitted permanent residents) are eligible to qualify as socially and economically disadvantaged individuals.

6. Disadvantaged Business Enterprise (DBE) Goals.

In connection with this solicitation and resulting contract, METRO has established the following goals for DBE participation:

____% of the total dollar amount of this proposal (Proposal Total).

7. Bidding Requirements and Procedures.

(a) Each Bidder must give assurance of meeting METRO's DBE percentage goals set forth in II.A.5. for participation by disadvantaged business enterprises in the performance of any contract resulting from this solicitation. Exhibit 1, DBE ASSURANCE STATEMENT, must be completed and signed by each bidder. The DBE ASSURANCE STATEMENT must be submitted as a part of the bid.

(b) Bidders shall submit with their bids the DBE ASSURANCE STATEMENT and the CONTRACTOR AND FIRST TIER SUBCONTRACTOR PARTICIPATION form (Exhibit 2) identifying the names, respective scopes of work and dollar values of each proposed DBE subcontractor to participate in the contract work. Failure to submit CONTRACTOR AND FIRST TIER SUBCONTRACTOR PARTICIPATION form by the specified date will result in bid rejection. If after exercising every reasonable effort the bidder has been unable to meet METRO's DBE goals, the bidder must submit to the Affirmative Action Office evidence of sufficient reasonable efforts made (at a minimum, documentation of the steps outlined in II.A.7.) to obtain the goals.

(c)   The Affirmative Action Office of the Metropolitan Transit Authority will provide holders of the contract documents with a list of identified DBEs upon request. The bidder may rely on written representations by subcontractors/suppliers regarding their status as DBEs. However, prior to award of this contract, as requested by METRO, DBEs and joint ventures involving DBEs shall submit appropriate DBE affidavits for certification to METRO. On the basis of these disclosures and any other relevant information, should METRO determine a firm not be a legitimate DBE, the bidder(s) shall substitute bona fide DBE for METRO's consideration.

8.   To determine whether a bidder that has failed to meet DBE contract goals may be awarded the contract, METRO will determine whether the efforts the bidder made to obtain DBE participation were "good faith efforts". Efforts that are merely pro forma are not good faith efforts to meet the goals. Efforts to obtain DBE participation are not good faith efforts to meet the goals, even if they are sincerely motivated, if given all relevant circumstances, they could not reasonably be expected to produce a level of DBE participation sufficient to meet the goals. In order to award a contract to a bidder that has failed to meet DBE contract goals, METRO must determine that the bidder's efforts were those that, given all relevant circumstances, a bidder actively and aggressively made efforts to meet the goals.

9.   Bidders are informed that price alone does not constitute an acceptable basis for rejecting DBE bids unless the bidder can demonstrate that no reasonable price can be obtained from DBEs. METRO may award the contract to any bidder which has submitted a responsive bid and demonstrates that it has made sufficient reasonable efforts to meet the DBE contract goals. A bidder's failure to meet the DBE goals or to show reasonable efforts to that end will constitute grounds for bid rejection. Such reasonable efforts include, but are not limited to, considering:

(a)   Whether the Contractor attended any presolicitation or pre-bid meetings that were scheduled by the recipient to inform DBEs of contracting and subcontracting opportunities;

(b) Whether the Contractor advertised in general circulation, trade associations, and minority-focus media concerning the subcontracting opportunities;

(c) Whether the Contractor provided written notice to a reasonable number of specific DBEs that their interest in the contract was being solicited in sufficient time to allow the DBEs to participate effectively;

(d) Whether the Contractor followed up initial solicitations of interest by contacting DBEs to determine with certainty whether the DBEs were interested;

(e) Whether the Contractor selected portions of the work to be performed by DBEs in order to increase the likelihood of meeting the DBE goals (including, where appropriate, breaking down contracts into economically feasible units to facilitate DBE participation);

(f) Whether the Contractor provided interested DBEs with adequate information about the plans, specifications and requirements of the contract;

(g) Whether the Contractor negotiated in good faith with interested DBEs, not rejecting DBEs as unqualified without sound reasons based on a thorough investigation of their capabilities;

(h) Whether the Contractor made efforts to assist interested DBEs in obtaining bonding, lines of credit, or insurance required by the recipient or Contractor;

(i) Whether the Contractor effectively used the services of available minority community organizations; minority contractors' groups, local, state and Federal minority business assistance offices; and other organizations that provide assistance in the recruitment and placement of DBEs; and

(j) Whether the Contractor submitted for each DBE contacted but considered unavailable by the bidder, (1) a DISADVANTAGED BUSINESS UNAVAILABILITY CERTIFICATE (Exhibit 5) and (2) a detailed statement from the bidder of the reasons for the bidder's conclusion.

Additionally, efforts to negotiate with DBEs for specific sub-bids will be reviewed to determine:

o   The names, addresses, and telephone numbers of DBEs and the dates that they were contacted;

o   A description of the information provided to DBEs regarding the plans and specifications for portions of the work to be performed;

o   A detailed statement of the reasons why additional prospective agreements with DBEs needed to meet the stated goals were not reached;

o   Designation, in writing, of a liaison officer who administers the bidder's minority or disadvantaged business enterprise utilization program;

o   Expansion of search for DBEs to a wider geographical area than the area in which the bidder generally seeks subcontractors if use of the customary solicitation area does not result in meeting the goals by the bidder.

B.   Determination of Percentage of DBE Participation.

1.   Once a firm is determined to be an eligible DBE, the total dollar value of the contract awarded to the DBE is counted toward the applicable DBE goals.

2.   METRO or a contractor may count toward its DBE goals a portion of the total dollar value of a contract with an eligible joint venture equal to the percentage of the ownership and controls of the DBE partner in the joint venture.

3.   (a)   METRO or a contractor may count toward its DBE goal only expenditures to DBEs that perform a commercially useful function in the work of a contract. A DBE is considered to perform a commercially useful function when it is responsible for execution of a distinct element of the work of a contract and carrying out its responsibilities by actually performing, managing, and supervising the work involved. To determine whether a DBE is performing a commercially useful function, METRO or a contractor shall evaluate the amount of work subcontracted, industry practices, and other relevant factors.

(b)  Consistent with normal industry practices, a DBE may enter into subcontracts. If a DBE contractor subcontracts a significantly greater portion of the work of the contract than would be expected on the basis of normal industry practices, the DBE shall be presumed not to be performing a commercially useful function. The DBE may present evidence to rebut this presumption to METRO. METRO's decision on the rebuttal of this presumption is subject to review by DOT.

5.  METRO or a contractor may count toward its DBE goals expenditures for materials and supplies obtained from DBE suppliers and manufacturers, provided that the DBEs assume the actual and contractual responsibility for the provision of the materials and supplies as follows:

(a)  METRO or a contractor may count its entire expenditure to a DBE manufacturer (i.e., a supplier that produces goods from raw materials or substantially alters them before resale), or;

(b)  METRO may count sixty percent (60%) of its expenditures to DBE suppliers that are not manufacturers, provided that the DBE supplier performs a commercially useful function in the supply process.

The degree of DBE goal attainment by utilization of DBEs and disadvantaged-majority joint ventures will be calculated as in the following examples:

-  A joint venture consisting of disadvantaged and majority business enterprises, functioning as a prime contractor, will be credited with DBE participation on the basis of percentage of profit to accrue to the DBE. For example, if a DBE-majority joint venture proposes to perform 50 percent of a project quoted at $500,000 and 50 percent of the profits are to accrue to the DBE partner in the joint venture, DBE participation will be credited as 25 percent of the work, or $125,000.

-  DBE contractors will be credited with DBE participation for that portion of the contract which they perform and that portion subcontracted to DBE firms. For example, if a DBE contractor proposes to perform 50 percent of a project quoted at $500,000 and subcontracts 25 percent to a majority firm and 25 percent to DBE firms, DBE participation will be credited as 75 percent of the work, or $375,000.

Case 4:93-cv-03651 Document 1 Filed in TXSD on 11/16/93 Page 94 of 106

- Only the fee of a DBE distributor or supplier, which is not contractually tied to the contractor and/or which performs only minor responsibilities in agreement with the manufacturer of construction materials enters into a contract with a prime contractor for materials noting that a DBE shall be the distributor, only the agreement between the manufacturer and the distributor is a contract with a DBE when the distributor has no substantial role in delivery arrangements or risk for defective products or late delivery. Hence, in an instance where the DBE distributor's fee is two percent of the total contract price, only that amount would be credited toward the DBE goals.

- No meaningful DBE goal is achievable unless great care is taken to ensure that contracts let pursuant to the goal requirement are let only to bona fide DBEs. METRO bidders and contractors are expected to exercise the greatest possible care that DBE firms with whom joint ventures are formed and subcontracts are let are bona fide.

C. Reporting and Record-keeping Requirements.

1. The Contractor shall submit periodic reports of contracting with DBEs in such form and manner and at such time as prescribed by METRO. VENDOR PAYMENT REPORT(S) are required to be submitted with each invoice.

2. The Contractor and subcontractors shall permit access to their books, records, and accounts by the Office of Civil Rights of the Urban Mass Transportation Administration and METRO's Assistant to the General Manager for Affirmative Action or a designated representative for the purpose of investigation to ascertain compliance with these specified requirements. Such records shall be maintained by the Contractor in a fashion which is readily accessible to METRO for a minimum of three years following completion of this contract.

3. To ensure that all obligations under any contract awarded as a result of this bid/solicitation are met, METRO will conduct periodic reviews of the Contractor's DBE involvement efforts during contract performance. The Contractor shall bring to the attention of METRO's Assistant to the General Manager for Affirmative Action any situation in which regularly scheduled progress payments are not made to DBE subcontractors.

PART III - TITLE VI OF THE CIVIL RIGHTS ACT OF 1964 (49 USC
    Section 2000d) OBLIGATIONS

During the performance of this contract the Contractor, for itself,
its assignees and successors in interest (hereinafter referred to as
the "Contractor") agrees as follows:

A.  Compliance with Regulations.

    The Contractor shall comply with the Regulations relative to
    nondiscrimination in federally-assisted programs of the
    Department of Transportation (hereinafter, "DOT") Title 49, Code
    of Federal Regulations, Part 21, as they may be amended from
    time to time (hereinafter referred to as the Regulations), which
    are herein incorporated by reference and made a part of this
    contract.

B.  Nondiscrimination.

    The Contractor, with regard to the work performed by it during
    the contract, shall not discriminate on the grounds of race,
    color, religion, sex or national origin in the selection and
    retention of subcontractors, including procurements of materials
    and leases of equipment.  The Contractor shall not participate
    either directly or indirectly in the discrimination prohibited
    by Section 21.5 of the Regulations, including employment
    practices when the contract covers a program set forth in
    Appendix B of the Regulations.

C.  Solicitations for Subcontracts, Including Procurements of
    Materials and Equipment.

    In all solicitations either by competitive bidding or
    negotiation made by the Contractor for work to be performed
    under a subcontract, including procurements of materials and
    leases of equipment, each potential subcontractor or supplier
    shall be notified by the Contractor of the Contractor's
    obligations under this contract and the Regulations relative to
    nondiscrimination on the grounds of race, color, sex or national
    origin.

D.  Information and Reports.

    The Contractor shall provide all information and reports
    required by the Regulations or directives issued pursuant
    thereto, and shall permit access to its books, records,
    accounts, other sources of information, and its facilities as
    may be determined by METRO or the Urban Mass Transportation
    Administration (UMTA) to be pertinent to ascertain compliance

with such Regulations, orders and instructions. Where any
information is required or a contractor is in the exclusive
possession of another who fails or refuses to furnish this
information, the Contractor shall so certify to METRO, or UMTA,
as appropriate, and shall set forth what efforts it has made to
obtain the information.

E.   Sanctions for Noncompliance.

In the event of the Contractor's noncompliance with the
nondiscrimination provisions of this contract, METRO shall
impose such Contract sanctions as it or UMTA may determine to be
appropriate, including, but not limited to:

1.   Withholding of payments to the Contractor under the
     contract, in whole or in part.

2.   Cancellation, termination or suspension of the contract, in
     whole or in part.

3.   Denial of the Contractor to participate in any further
     contracts awarded by METRO.

F.   Incorporation of Provisions.

The Contractor shall include the provisions of paragraphs (A)
through (F) in every subcontract, including procurements of
materials and leases of equipment, unless exempt by the
Regulations, or directives issued pursuant thereto. The
Contractor shall take such action with respect to any
subcontract or procurement as METRO or UMTA may direct as a
means of enforcing such provisions including sanctions for
noncompliance; provided, however, that, in the event a
Contractor becomes involved in, or is threatened with,
litigation with a subcontractor or supplier as a result of such
direction, the Contractor may request METRO to enter into such
litigation to protect the interests of METRO, and, in addition,
the Contractor may request the United States to enter into such
litigation to protect the interests of the United States.

EXHIBIT 6(a)

METROPOLITAN TRANSIT AUTHORITY
DISADVANTAGED BUSINESS ENTERPRISES
and
EQUAL EMPLOYMENT OPPORTUNITY
REQUIREMENTS
for
NEGOTIATED CONTRACTS AND AGREEMENTS

Pursuant to Title VI and VII of the Civil Rights Act of 1964, as amended, Section 110 of the UMTA Agreement (terms and conditions), Executive Order 11246 as amended by Executive Order 11375 and implemented in the Houston SMSA area by the Department of Labor's Office of Federal Contract Compliance Programs (OFCCP), Executive Order 11625 concerning the utilization of Disadvantaged Business Enterprises (DBEs), Department of Transportation Order 4000.7A, Urban Mass Transportation Administration Circulars 1155.1 and 4716.1A, 49 CFR Part 23 as amended, and the Metropolitan Transit Authority Board policies on equal employment opportunity and the utilization of DBEs, the Contractor is required to take certain actions designed to assure equitable participation of socially economically disadvantaged individuals in its workforce and provide maximum feasible opportunity for the participation of DBEs.

Part I details the DBE requirements; Part II outlines Equal Employment Opportunity requirements and Part III sets forth obligations under Title VI of the Civil Rights Act of 1964, as amended. A PROPOSAL WHICH FAILS TO INCLUDE THE DBE ASSURANCE STATEMENT AND THE PROPOSED SCHEDULE OF DBE PARTICIPATION SHALL BE NON-RESPONSIVE AND SHALL BE REJECTED.

PART I.    UTILIZATION OF DISADVANTAGED BUSINESS ENTERPRISES

A.    DOT/UMTA Disadvantaged Business Policy.

    1.    It is the policy of the Department of Transportation (DOT) that disadvantaged business enterprises, as defined below, shall have the maximum opportunity to participate in the performance of contracts financed in whole or in part with federal funds under this Contract.

Case 4:93-cv-03651 Document 1 Filed in TXSD on 11/16/93 Page 98 of 106

2. The Contractor agrees to ensure that DBEs have the maximum opportunity to participate in the performance of contracts and subcontracts financed in whole or in part with federal funds provided under this Contract. In this regard, all contractors shall take all necessary and reasonable steps in accordance with 49 CFR Part 23 as amended to ensure that DBEs have the maximum opportunity to compete and perform on this project. The Contractor and subcontractors shall not discriminate on the basis of race, color, national origin or sex in the award and performance of DOT-assisted contracts.

3. The Contractor is hereby informed that METRO has established goals for the participation of DBEs under this Contract. Since subcontractor awards by the Contractor on this solicitation to DBE firms and disadvantaged-majority joint ventures are crucial to the achievement of METRO DBE goals, this Contract includes requirements with which the Contractor must comply.

B. Definitions of DBEs

The term "Disadvantaged Business" means a small business concern owned and controlled by socially and economically disadvantaged individuals. For the purpose of this definition "socially and economically disadvantaged small business concern" means any small business concern:

(a) which is at least 51 per cent owned by one or more socially and economically disadvantaged individuals; or, in the case of any publicly owned business, at least 51 per cent of the stock of which is owned by one or more socially and economically disadvantaged individuals; and

(b) whose management and daily business operations are controlled by one or more of the socially and economically disadvantaged individuals who own it.

"Small business concern" means a small business as defined pursuant to Section 3 of the Small Business Act and relevant regulations promulgated pursuant thereto except that a small business concern shall not include any concern or group of concerns controlled by the same socially and economically disadvantaged individual or individuals which has annual average gross receipts in excess of $14 million over the previous three fiscal years. The Secretary shall adjust this figure from time to time for inflation.

METRO makes a rebuttable presumption that individuals in the following groups are socially and economically disadvantaged and reserves the right to determine, on a case-by-case basis, that individuals who are not members of one of the following groups are socially and economically disadvantaged:

(a) "Black Americans," which includes persons having origins in any of the Black racial groups of Africa;

(b) "Hispanic Americans," which includes persons of Mexican, Puerto Rican, Cuban, Central or South American, or other Spanish or Portuguese culture or origin, regardless of race;

(c) "Native Americans," which includes person who are American Indians, Eskimos, Aleuts, or Native Hawaiians.

(d) "Asian-Pacific Americans," which includes persons whose origins are from Japan, China, Taiwan, Korea, Vietnam, Laos, Cambodia, the Philippines, Samoa, Guam, the U.S. Trust Territories of the Pacific, and the Northern Marianas; and

(e) "Asian-Indian Americans," which includes persons whose origins are from India, Pakistan, and Bangladesh.

(f) Women, and

(g) any other minorities or individuals found to be disadvantaged by the Small Business Administration pursuant to Section 8(a) of the Small Business Act.

Only citizens of the United States (or lawfully admitted permanent residents) are eligible to qualify as socially and economically disadvantaged individuals.

C. DBE Goals.

In connection with this solicitation and resulting contract, METRO has established the following goals for DBE participation:

_____% of the total dollar amount of this proposal (Proposal Total).

D. Reporting and Record-keeping Requirements.

1. The Contractor shall submit periodic reports of contracting with DBEs in such form and manner and at such time as prescribed by METRO. VENDOR PAYMENT REPORT(S) are required to be submitted with each invoice.

2.   The Contractor and subcontractors shall permit access to
     their books, records, and accounts by the Office of Civil
     Rights of the Urban Mass Transportation Administration and
     METRO's Assistant to the General Manager for Affirmative
     Action or a designated representative for the purpose of
     investigation to ascertain compliance with these specified
     requirements.   Such records shall be maintained by the
     Contractor in a fashion which is readily accessible to
     METRO for a minimum of three years following completion of
     this Contract.

3.   To ensure that all obligations under this Contract are met,
     METRO will conduct periodic reviews of the Contractor's DBE
     involvement efforts during contract performance.   The
     Contractor shall bring to the attention of METRO's
     Assistant to the General Manager for Affirmative Action any
     situation in which regularly scheduled progress payments
     are not made to DBE subcontractors.

E.  Additional Requirements.

1.   The Contractor is encouraged to utilize the services of
     banks owned and controlled by socially economically
     disadvantaged persons.   Such utilization is one of the
     steps which demonstrates the Contractor's compliance with
     METRO's DBE Program, although deposits in these banking
     institutions are not considered toward fulfillment of the
     DBE goals.

2.   The Contractor shall notify the Assistant to the General
     Manager for Affirmative Action of METRO of the names of any
     substitute subcontractors under this Contract.

3.   The Contractor may review documents in METRO's Affirmative
     Action Office which specify:

     o    guidance for making determinations for social and
          economic disadvantage,

     o    challenge procedure to determine whether an individual
          presumed to be socially and economically disadvantaged
          is in fact socially and economically disadvantaged,
          and

     o    appeals procedure for denial of certification as a
          DBE.

PART II - EQUAL EMPLOYMENT OPPORTUNITY

Section 110a of the Urban Mass Transportation Administration Grant Agreement, Part II

A.    Equal Employment Opportunity

The following conditions are applicable:

1.    In connection with the carrying out of the Project, the Contractor shall not discriminate against any employee or applicant for employment because of race, color, age, creed, sex, or national origin.  The Contractor shall take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex, age, or national origin.  Such action shall include, but not be limited to, the following:  employment, upgrading, demotion or transfer, recruitment or recruitment advertising, layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship.  The Contractor shall insert the foregoing provision (modified only to show the particular contractual relationship) in all of its contracts in connection with the development or operation of the Project, except contracts for standard commercial supplies or raw materials and construction contracts subject to the provisions of Section 110.a of the UMTA Grant Agreement, and shall require all such subcontractors to insert a similar provision in all subcontracts, except subcontracts for standard commercial supplies or raw materials.

PART III - TITLE VI OF THE CIVIL RIGHTS ACT OF 1964 OBLIGATIONS

During the performance of this Contract, the Contractor, for itself, its assignees and successors in interest (hereinafter referred to as the "Contractor") agrees as follows:

A.    Compliance with Regulations.

The Contractor shall comply with the regulations relative to nondiscrimination in federally-assisted programs of the Department of Transportation (hereinafter "DOT") Title 49, Code of Federal Regulations, Part 21, as they may be amended from time to time (hereinafter referred to as the Regulations), which are herein incorporated by reference and made a part of this Contract.

B.  Nondiscrimination

The Contractor, with regard to the work performed by it during the Contract, shall not discriminate on the grounds of race, color, sex or national origin in the selection and retention of subcontractors, including procurements of materials and leases of equipment. The Contractor shall not participate either directly or indirectly in the discrimination prohibited by Section 21.5 or the regulations, including employment practices when the Contract covers a program set forth in Appendix B of the regulations.

C.  Solicitations for Subcontracts, Including Procurements of Materials and Equipment.

In all solicitations either by competitive bidding or negotiation made by the Contractor for work to be performed under a subcontract, including procurements of materials or leases of equipment, each potential subcontractor or supplier shall be notified by the Contractor of the Contractor's obligations under this Contract and the regulations relative to nondiscrimination on the grounds of race, color, sex or national origin.

D.  Information and Reports.

The Contractor shall provide all information and reports required by the regulations or directives issued pursuant thereto, and shall permit access to its books, records, accounts, other sources of information, and its facilities as may be determined by METRO or the Urban Mass Transportation Administration (UMTA) to be pertinent to ascertain compliance with such regulations, orders and instructions. Where any information is required or a contractor is in the exclusive possession of another who fails or refuses to furnish this information, the Contractor shall so certify to METRO, or UMTA, as appropriate, and shall set forth what efforts it has made to obtain the information.

E.  Incorporation of Provisions.

The Contractor shall include the provisions of paragraphs (A) through (F) in every subcontract, including procurements of materials and leases of equipment, unless exempt by the regulations, or directives issued pursuant thereto. The Contractor shall take such action with respect to any subcontract or procurement as METRO or UMTA may direct as a means of enforcing such provisions including sanctions for

CIVIPDF - www.fasto.com

noncompliance; provided, however, that, in the event a contractor becomes involved in, or is threatened with, litigation with a subcontractor or supplier as a result of such direction, the Contractor may request METRO to enter into such litigation to protect the interests of METRO, and, in addition, the Contractor may request the United States to enter into such litigation to protect the interest of the United States.

F.   Sanctions for Violations and Noncompliance.

If at any time METRO has reason to believe that the Contractor is in violation of its obligations under these provisions or has otherwise failed to comply with these provisions, METRO may, in addition to pursuing any other available legal remedy, commence proceedings to impose sanctions on the Contractor. Such sanctions may include, but not be limited to, one or more of the following:

1.   The suspension or withholding of any payment or part thereof until such time that compliance is demonstrated;

2.   The termination or cancellation of the Contract in whole or in part unless compliance is demonstrated within a reasonable time; and

3.   The denial of the Contractor to participate in any future contracts awarded by METRO.

In the event of the Contractor's noncompliance with the nondiscrimination provisions of this Contract, METRO shall impose such contract sanctions as it or UMTA may determine to be appropriate, including, but not limited to:

1.   Withholding payments to the Contractor under the Contract, in whole or in part.

2.   Cancellation, termination or suspension of the Contract, in whole or in part.

Case 4:93-cv-03651  Document 1  Filed in TXSD on 11/16/93  Page 104 of 106

## EXHIBIT 7

### DBE ASSURANCE STATEMENT

The undersigned certifies that he/she has read, understands and agrees to be bound by the disadvantaged business provisions set forth in this Section. The undersigned further certifies that he/she is legally authorized by the offeror to make the statements and representations in this section and that said statements and representations are true and accurate to the best of his/her knowledge and belief. The FAILURE TO COMPLY WITH THE DBE PROVISIONS OF THIS CONTRACT WILL BE CONSIDERED A MATERIAL BREACH OF CONTRACT. ATTENTION IS DIRECTED TO GENERAL PROVISION 21 "SUBCONTRACTORS."


### DISADVANTAGED BUSINESS GOAL _____%


The undersigned understands that if any of the statements and representations are made, knowing them to be false, or if there is a failure to implement any of the stated intentions, objectives, goals, and commitments set forth therein without prior approval of METRO's General Manager or a designee, the offeror will be subject to the loss of any contract resulting from this offer and all future contract awards.


Signature _____

Title _____ Date of Signing _____

Firm or Corporate Name _____

Address _____

_____

Telephone Number _____

## TABLE OF CONTENTS

PAGE

I.    Disadvantaged Business Enterprise (DBE) Policy           1

II.   DBE Program Overview                                     2

III.  Definitions                                             3

IV.   DBE Program Organization                                5

V.    DBE Program Goals                                       12

      A. Procurements Other Than Transit Vehicles            12
      B. DBE Requirements for Transit Vehicle Manufacturers  15
      C. Policy Concerning Leases                            16
      D. Opportunities for Banks Owned and Controlled by
         Socially and Economically Disadvantaged Individuals 17

VI.   DBE Certification Procedures                           18

      A. Determination of Small Business Status             19
      B. Determination of Ownership and Control             22
      C. Information to Assist in Determining Legitimacy
         of DBEs                                            25
      D. Information to Assist in Determining Legitimacy
         of Joint Ventures                                  27
      E. Guidance for Making Determination for Social and
         Economic Disadvantage                             28

VII.  Procedures to Ensure That DBEs Have an Equitable
      Opportunity to Compete for Contracts and Subcontracts 32

      A. A Description of the Methods by Which METRO Will
         Require Sub-recipients, Contractors, and
         Sub-contractors to Comply With Applicable DBE
         Requirements                                       36
      B. Means to Ensure that Competitors Make Good Faith
         Efforts to Meet DBE Contract Goals                 38
      C. Procedures to Require That Participating DBEs are
         Identified by Name of Competitors for Contracts   40

VIII. Maintenance of Records and Reports                    41

IX.   DBE Directory                                         43

7/001/269/3-90                                          2/19/90

Table of Contents (Cont'd)                                    PAGE

   X.  "Set-Aside" Program                                   44

   XI.  Exhibits                                             45

        1. Organization Chart - Executive Office             46
        2. Organization Chart - Affirmative Action Office    47
        3. Appeals  of Denial of Certification as a DBE      48
        4. Challenge Procedure                               50