**UNITED STATES DISTRICT COURT**        **SOUTHERN DISTRICT OF TEXAS**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
ENTERED

**NOV 13 1997**

Michael N. Milby, Clerk

| | | |
|---|---|---|
| HOUSTON CONTRACTORS ASSOCIATION, | § § § | |
| Plaintiff, | § § | |
| versus | § § | CIVIL ACTION H-93-3651 |
| METROPOLITAN TRANSIT AUTHORITY OF HARRIS COUNTY, | § § | |
| Defendant. | § | |

## Opinion on Summary Judgment

1.     *Introduction.*

Race is politics not biology.  Who is whom and what happens to them depends entirely on political decisions about society and economics–not on genetics.

Because race is inescapably arbitrary, basing governmental action on race offends the American Constitution.  Race is arbitrary because it is unrelated to the accomplishment of a public service and because the categories are hollow.  Assigning governmental benefits to people by their skin color does not quit being arbitrary because the advocates claim that a program has a progressive purpose; a principle wrong for Eugene Talmadge is wrong for Jesse Jackson.

Because it must operate under the Constitution, the Metropolitan Transit Authority may not use its power to treat similar people differently unless the distinction is directly related to an objective function of its legitimate responsibility for transportation.  Nothing about transportation depends on the race of the person–not employees, officers, taxpayers, riders, suppliers, or contractors.

An individual may reliably be identified by sex, eliminating the problem of imprecise categories, but sex remains unrelated to the provision of public transportation.

244

2.      *Metropolitan Transit Authority of Harris County.*

Created in 1978, Metropolitan Transit Authority of Harris County is a dependent governmental district furnishing transportation to the Houston metropolitan area, as authorized by the Texas legislature.  Its policy is set by a board appointed by its constituent city governments.  In 1996, Metro had a capital budget of $500 million, much of which is equipment.  The construction budget for roads, bridges, terminals, and similar projects is about $200 million, representing in recent years about 25% of that kind of construction in Houston.

Metro derives its funds from four sources: fares, local sales tax, Texas grants, and federal grants.  State and federal grants tend to be project-specific, and they carry requirements about social responsiveness.  Metro uses subcontractors' race and sex to allocate 21% of its purchases.

3.      *Houston Contractors Association.*

Houston Contractors Association is a private voluntary group of construction-related businesses.  Some of its members bid frequently on jobs with Metro.

An association may bring a lawsuit if its member contractors are directly harmed by the program.  To be a party to what the Constitution calls a "case or controversy," the association must show that (a) one of its members suffered harm directly from Metro's program and (b) a decision in its favor would alleviate the harm.  Simply put, the Constitution does not permit suits by mere bystanders or if the result will be an empty gesture.

Houston Contractors Association may bring this action about the constitutionality of the program; it stands in a direct relation to the program and its injurious consequences because:

- Some constituent contractors have been hurt because Metro required them to use higher-cost subcontractors than they would have without the racial program;

- Favored contractors do not have to incur the higher compliance costs of the program;

- The program has caused some of the members to lose subcontracting opportunities; and

Page 2.

- Metro's program makes the contractors vulnerable to a "responsiveness" review that is pure bureaucratic discretion.

4. *Federal Program.*

The United States Department of Transportation administers grants to state and local transit agencies through its component known as the Federal Transit Authority. FedTran must approve a transit agency's program for helping minority businesses before it can receive a grant under the federal program. FedTran treats the program as a *legal obligation*, with a failure to follow it being a violation of the grant's conditions.

For preference purposes the federal program defines minority-group membership as an individual who claims membership as a minority and who is "so regarded by that particular minority group."[1]

The difference between the two programs is relatively minor; the federal program uses "minority," "socially and economically disadvantaged individuals," "small business concern," and "disadvantaged" interchangeably while Metro uses "disadvantaged business enterprise." The essential commonality between them is that they require awarding contracts to people defined by sex, race, and ethnicity. The federal program requires the grant recipient to maintain a disadvantaged program with "practical" numerical goals as a condition for federal grants.[2] At least ten percent of the Department of Transportation's budget is devoted to designated beneficiaries.[3]

5. *Texas Program.*

Since 1987, Texas has had a law encouraging participation in contracts for businesses owned by minorities or disadvantaged people. By 1993, the state set recommended shares of the segments of project expenditures and defined categories it considered disadvantaged.

- Disadvantaged businesses are to share in 17 percent of construction, 11 percent of purchasing, and 24 percent of professional services, or a weighted average of these categories combined.

---

[1] 49 C.F.R. § 23.53 (1997).

[2] 49 C.F.R. § 23.41-53 (1997).

[3] Intermodal Surface Transportation Efficiency Act of 1991, Pub. L. No. 102-240, 105 Stat. 1919 (1991).

Page 3.

- The law approved these groups: women, blacks, Hispanics, Asian Americans, American Indians, and Alaska natives.[4]

It declares that a "minority business" includes entities more than 50 percent owned and controlled by members of minorities or majority ownership and control by females.

6.   *Metro Program.*

In 1990 Metro adopted its Disadvantaged Business Enterprise Program. The program requires bidders on Metro's contracts to use qualifying disadvantaged subcontractors and suppliers for at least 21% of the gross contract price. The program speaks of "good faith efforts," but when a bid is submitted, the contractor must identify the DBEs, their work, and their prices.

According to Metro, a disadvantaged business enterprise is a small business, managed and owned over 50% by socially and economically disadvantaged individuals.

Metro says that a person through whom an enterprise may qualify is someone who has suffered actual social disadvantage but not someone who merely has membership in a socially disadvantaged class. Metro says it considers whether the person individually has suffered disadvantage in education, employment, and business, but it does not examine the actual status of people in these categories: Black, Hispanic, Native American, Asian-Pacific, Asian-Indian, and female. Metro presumes that every member of these groups is socially and economically disadvantaged.

The program requires that these groups in the aggregate receive subcontracts at a rate of 21% of the dollar value.

7.   *Quotas, Goals.*

Metro says that the goals in the program are purely aspirational, but the terms of the program and the practice under it are quotas. The section of the plan with the "goals" is called "Set Asides." When a contractor's bid is the lowest, it is reviewed for technical and fiscal compliance. For instance, a bid that appears unreasonably low is reviewed for errors in arithmetic, materials, and labor or other oversights that might cause problems later.

---

[4]TEX. TRANSP. CODE § 451.251-53 (1997).

Page 4.

ClickPDF - www.fastio.com

Beyond engineering and financial double-checking, no bid is sent to the board for approval until the Affirmative Action Office has approved it.

The Affirmative Action Office reviews the contractor's certification, including Metro's form letters, that it intends to use specific minority subcontractors for specific dollar amounts. Metro corresponds about the program through the actual contract administration officer. It is expressed in mandatory terms, like:

> Evaluation of . . . your bid involves . . . an evaluation of your response to the Disadvantaged Business Enterprise provisions. As evidence of commitment in this regard, Metro requests that you enter into a Letter of Intent for each subcontractor and supplier . . . . Sample Letters of Intent are attached.
>
> The . . . percentages . . . are expected to match those . . . submitted with your bid.
>
> Failure to provide the required Letter(s) of Intent . . . will be cause for rejection of your bid.[5]

For some contracts, the program requires Metro to consider only bids made by DBEs, which effectively segregates part of Metro's third-party work to those officially-favored contractors, meaning that the disfavored ones will never have an opportunity to receive some of the contracts.[6]

The program administrator testified that minority participation was a contract term, fully enforceable by Metro. His department is called affirmative action, not equal opportunity. Contractors are forced to complete detailed forms showing the precise payments to approved subcontractors and suppliers. These forms have no function within Metro except to "ensure compliance" with the program as the Metro staffers "closely monitor" the contractors.[7]

---

[5]Letter from Günther Schieb, Sr., Contracts Administrator, Metropolitan Transit Auth., to Karen S. Steinem, Beyer Constr., Inc. (Mar. 21, 1996) (Exhibit 3 to Apr. 18, 1996, Hearing on Prelim. Inj.).

[6]Disadvantaged Business Enterprise Program, Metropolitan Transit Auth., § X "Set-Aside" Program (1990).

[7]*See* Letter from Carole A. Pinkett, Deputy Gen. Manager, Human Resources, Metropolitan Transit Auth., to Robert Barrow, Conrad Constr. Co., Inc. (July 21, 1995) (Exhibit 10 to Apr. 19, 1996, Hearing on Prelim. Inj.).

The program administrator testified that Metro treats the DBE commitment just like other contract terms, converting a moral obligation to use good faith into a legal obligation of the contract. He also said that Metro has at least one secret motive in requiring an identification of subcontractors; that purpose is to prevent bid shopping among subcontractors by prime contractors. This particular policy has no relation to the DBE program, and it protects prime contractors from one form of competition by other prime contractors.

It is not reasonably disputable that Metro imposes directly on contractors to obtain subcontracts for its officially-favored groups.

An aspiration to do wrong is wrong. A government run by arbitrary hope is still arbitrary. To test the logic that stating goals is permissible in a program no matter what, simply restate the goal with the implied reverse. None of the proponents of this program would tolerate a parallel section of the plan that said Metro only "hoped" that white males would get 79% of the contracts.

8.    *Affirmative Action.*

Once the courts began enforcing the Constitution's prohibition on arbitrary government through racial preferences, "affirmative action" was used to urge government managers to make sure they were not overlooking discriminatory practices that had not been eliminated.    In 1961, an executive order compelled all governmental agencies to include in their contracts an obligation that the contractor "not discriminate because of race, creed, color, or national origin" and that the contractor "will take affirmative action to ensure that . . . employees are treated . . . without regard to their race, creed, color, or national origin."[8]

In 1969, the executive branch established an office to promote growth of minority businesses and to coordinate efforts toward them.[9]    Two years later, an executive order declared that minority business enterprise means a business that is owned or controlled by

---

[8]Exec. Order No. 10,925, 3 C.F.R. 448 (1959-63); *see also* Exec. Order No. 11,246, 3 C.F.R. 339 (1964-65).

[9]Exec. Order No. 11,458, 3 C.F.R. 779 (1966-70).

Page 6.

one or more socially or economically disadvantaged persons; this order mentioned "Negroes, Puerto Ricans, Spanish-speaking Americans, American Indians, Eskimos, and Aleuts."[10]

In 1977, the government adopted an act establishing a separate fund for minority business enterprises; ten percent of the budget of federal contracting was allocated to these minority businesses.[11] This reminder of the government's responsibility not to discriminate evolved into a requirement that it discriminate.

9.    *The Law.*

The Constitution seeks to eliminate arbitrary governmental power. The Constitution accomplishes this through establishing the institutions of government and setting the procedures those institutions may and may not use. In addition to the rule that no majority may enact its purposes through means that restrict individuals' specific rights, like speech or religion, the Constitution requires that the government act in ways that are general, neutral, and prospective. This requirement of "due process of law" transcends policy preferences and establishes the rule of law. Arbitrary impositions are the antithesis of law.

As John Marshall wrote, "Let the end be legitimate, [then] all means that are appropriate . . . to that end, which are not prohibited [by] the letter and spirit of the constitution, are constitutional."[12] To ensure state and local governments met the same standards of integrity, the Constitution was amended in 1868 to say:

> No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.[13]

That means: when a government uses a classification to achieve its legitimate objective, the judiciary will examine how closely the means of classification fit with the purpose of the act–under the actual facts–to guarantee that individuals who are similarly

---

[10]Exec. Order No. 11,625, 3 C.F.R. 616 (1971-75).

[11]Public Works Employment Act of 1977, 42 U.S.C. § 6701-07 (1977).

[12]*McCulloch v. Maryland*, 17 U.S. 316 (1819).

[13]U. S. CONST. amend. XIV, §1.

CSXPDF - www.fastio.com

situated are similarly treated.  As the significance of the particular right increases, the vigor of the court's examination increases.

A governmental program favoring one person over another is arbitrary whenever the favoritism is based on a criterion unrelated to the legitimate goal of the program.

10.  *Race & Equal Protection.*

The Civil War and Reconstruction Congresses used race as a criterion for several welfare programs.  Some scholars argue that we should be bound by their interpretation that racial favoritism toward blacks was permissible under the Civil War amendments since they drafted them.[14]  We are bound by the adopted and ratified text, and without reference to the drafters' personal views, the text is reasonably clear.

If we should look to the drafters' own practices, a complete examination of 1865 to 1875 reveals that Congress used race as a criterion for benign and hostile legislation.[15]  They legislated black-only welfare at the same time they were legislating white-only schools.  Historical ignorance allows simplifications of America's long, complex struggle to achieve its ideals.  Both the ideals and the struggle persist.

Those who legislated as well as those who fought to preserve and improve the Union nearly equaled the accomplishment of the Founders in establishing individual liberty through the rule of law.  The Civil Rights Act of 1866 was the first attempt known to history of a people's use of government to eliminate racial barriers to legal equality.

11.  *Classes & Partial Measures.*

Partial measures, as they were called in 1789, offend the constitutional requirements of generality and neutrality found in phrases like "due process of law," "equal protection of

---

[14]*See, e.g.,* Eric Schnapper, *Affirmative Action and the Legislative History of the Fourteenth Amendment,* 71 VA. L. REV. 753 (1985).

[15]*See Bolling v. Sharpe,* 347 U.S. 497 (1954); HAROLD M. HYMAN, A MORE PERFECT UNION: THE IMPACT OF THE CIVIL WAR AND RECONSTRUCTION ON THE CONSTITUTION 202-03, 295-297, 389 (1973); MICHAEL K. CURTIS, NO STATE SHALL ABRIDGE: THE FOURTEENTH AMENDMENT AND THE BILL OF RIGHTS (1986); WILLIAM GUTHRIE, LECTURES ON THE FOURTEENTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES (1898); EARL M. MALTZ, CIVIL RIGHTS, THE CONSTITUTION AND CONGRESS, 1863-1869 (1990); Alfred H. Kelly, *The Congressional Controversy over School Segregation, 1867-1875,* AM. HIST. REV. LXIV, 540-42 (1959).

the law," and in Texas "due course of law" and "equal rights." The Texas Constitution has an express prohibition of local and special laws[16] as do the Constitutions of 31 other states.

In 1852, the Texas Supreme Court described the principle this way: "the terms 'law of the land' . . . are . . . in their most usual acceptation, regarded as general public laws binding upon all members of the community . . . and not partial or private laws, affecting the rights of private individuals or classes of individuals."[17]

Laws that aim at particular people, isolated groups like poor minorities or narrow groups like building contractors, share the defect under the Constitution of lacking generality. Because they allow the community to impose on a particular few, they are normally not constitutional unless the connection between the purpose and the narrowness is compellingly demonstrated.[18]

12.    *Classifications by Race.*

In constitutional law, lawyers talk about criteria being too broad and too narrow to be rationally related to some particular governmental purpose.

Race is both too broad and too narrow–over-inclusive and under-inclusive. Because race never seemed to have a rational basis for governmental distinctions, American courts started calling them "suspect" classifications. They were suspected of being arbitrary. Racial distinctions were found to have been supported only by prejudice, contention, presumption, and ignorance, imposing a peculiar vision of a proper community.

13.    *Race.*

If what we mean by "race" is a cluster of external bodily traits, then there are groups of people who are similar in those traits like facial structure and skin color. The three principal groups, however, show nearly as much variation within the group as exists between groups. As the anthropologist Ashley Montagu observed in 1942:

> [P]hysically distinguishable populations of man . . . . are
> often called races. Distinctive populations of this kind are

---

[16]TEX. CONST. art. 3, § 56.

[17]*Janes v. Administrators of Reynolds,* 2 Tex. 24 (1852)(Hemphill, C.J.).

[18]*See, e.g.,* JOHN H ELY, DEMOCRACY AND DISTRUST: A THEORY OF JUDICIAL REVIEW (1980).

> not myths, but neither are they races in the sense . . . that
> physical and mental traits are linked . . . .[19]

The American Anthropological Association has reaffirmed this scientific view of race again
this year:

> The species is not divided into exclusive genetically distinct,
> homogeneous groupings similar to subspecies, as the concept
> of "race" implies. All human groups share many features
> with other groups, and it is impossible to draw rigid
> boundaries around them. Genetically there are greater
> differences between individuals within a group defined
> popularly as a race than there are between two "races." There
> are no pure "races," and no groups are physically,
> intellectually or morally superior, or inferior, to others.[20]

Races may have a physical component, but the physical distinctions are unrelated
to social and intellectual ability. The presumption of superiority and inferiority are supplied
by the political and economic context. Once a racial label is applied, it has social effects.[21]

> [F]rustration and aggression . . . play an important role in
> preparing the individual personality for "racial" hostility. . . .
> [N]either frustration nor aggression leads to "racial" hostility
> unless the conditions . . . favor such a development. These
> conditions are always artificially constructed in economic,
> political, and social frameworks wherein "racial" hostility can
> be used to advantage by the individual or by the group within
> that framework.[22]

14.   *Classification by Race.*

When government decides to classify by race, it must decide who is who. American
governments have used a variety of standards for who counts as a member of a group. The
most common rule for segregation and miscegenation statutes was that a person of one-

---

[19]ASHLEY MONTAGU, MAN'S MOST DANGEROUS MYTH: THE FALLACY OF RACE 24 (4th ed. 1964).

[20]Draft American Anthropological Assoc. Statement on "Race" (1997).

[21]ANTHONY APPIAH, RACE, CULTURE, IDENTITY, IN COLOR CONSCIOUSNESS 77-78 (Anthony Appiah &
Amy Gutmann eds. 1996). *See* THOMAS SOWELL, THE ECONOMICS & POLITICS OF RACE (1983); MARVIN HARRIS,
PATTERNS OF RACE IN THE AMERICAS (1964).

[22] MONTAGU at 354.

eighth black ancestry was "legally" black.[23] Occasionally "one drop of blood" from the subordinate group was enough to disqualify a person from membership in the favored group.[24]

Upholding racial segregation of public transportation, in 1896 the Supreme Court acknowledged that:

> The power to assign . . . obviously implies the power to determine to which race the passenger belongs, as well as the power to determine who, under the laws of the particular state, is to be deemed a white, and who a colored person.[25]

Now, for inclusion in the favored group the federal government uses the standard that if one is "regarded by that group" as a member he counts as one of them. This social test is equally indefensible as the biological one-drop-of-blood test. This means of grouping people raises the specter of self-appointed racial spokesmen acting as keepers of access to government contracts and the specter of criminal prosecutions for fraudulent use of categories.

15. *Ethnicity*.

The government is not using racial categories even in the limited sense that science might recognize race. It uses politically expedient and administratively convenient categories of group identity that change frequently. It has expanded the limited racial labels by using ethnicity instead.

If you classify people by the three principal racial trends–Negro, Caucasian, and Oriental–"whites" appear to be the majority. Those "whites" include people whose ancestors came from the Iberian Peninsula and from the Indian subcontinent. Under the current racial classification system, Americans identify themselves as:

---

[23]MONTAGU at 402-03.

[24]SOWELL, THE ECONOMICS AND POLITICS OF RACE (1983) .

[25]*Plessy v. Ferguson*, 163 U.S.537, 549 (1896).

CHIPDF - www.fastio.com

80.3% White        12.1% Black        2.9% Asian or Pacific Islander
  0.8% American Indian, Eskimo, Aleut        3.9% Other.[26]

In 1970 census data, they identified their *ethnicity* as:

14% British        13% German        11% Black
  8% Irish        5% Hispanic        42% other.[27]

As one would expect from a melting pot, no group as identified by its self-ascribed ethnicity is a numerical majority.

Ethnic labels are as arbitrary as racial ones. Under the current census category of "Asian" you find lumped together a Catholic Hispanic from Manila and a Hindu from Bombay, both of whom are Caucasian and each of whom has entirely different social histories. In Houston the label "Asian" includes four distinct populations: Filipino, Vietnamese, Chinese, and Pakistani-Indian. These subgroups have distinct histories.[28]

In the federal executive order of 1969, "Puerto Rican" and "Spanish-speaking American" were two distinct categories, but Puerto Ricans are all Americans and mostly speak Spanish. Metro lumps Americans from India and Pakistan together, showing a remarkable ignorance of cultural distinctions and historical conflict.

16.    *Classifications by Sex.*

This technique of imposing one view of "community" was reflected in legally prescribed roles in society by sex, as when the United States Supreme Court said,

> The paramount destiny and mission of woman are to fulfil
> the noble and benign offices of wife and mother.
>
> [I]n view of the peculiar characteristics . . . of woman, it is
> within the province of the legislature to ordain what offices,

---

[26] BUREAU OF THE CENSUS, U.S. DEP'T OF COMMERCE, 1990 CENSUS OF POPULATION, 3 tbl. 3 (1992). *See* SOWELL at 183-85; Alex M. Johnson, *Destabilizing Racial Classifications Based on Insights Gleaned from Trademark Law*, 84 CAL. LAW REV. 901, fn.49 (1996).

[27] BUREAU OF THE CENSUS, U.S. DEP'T OF COMMERCE, CURRENT POPULATION REPORTS, PUB. NO. 116, 7 (1970).

[28] STEPHEN L. KLINEBERG, HOUSTON'S ETHNIC COMMUNITIES (3d. 1996).

Page 12.

positions, and callings shall be filled and discharged by [them].[29]

These classifications turned out to have no basis in reality, and they have ultimately been rejected as good faith legislative grounds when courts applied the Constitution's cold eye of rationality.[30]

17.     *Women & Blacks.*

After America gained her independence, the traditional disabilities of women were continued in politics, society, and law. Recognition of a woman's individuality instead of her sex was slow to come. America sacrificed the intelligence, industry, and courage of generations of women to the inertia of custom.

Blacks have a different history. As bad as the habitual exclusion of women from power was, it was not chattel slavery or the Jim-Crow South. Combining these, black women have an historical burden without parallel in America.

Because Metro set one percentage for both blacks and women, the plan lacks integrity as law or history. The federal program *requires* that women *not* be separate from minorities, revealing the ward-healer politics of the classifications and percentages.[31]

18.     *Persistent Racism.*

Assumptions about people–usually negative–based on their appearance persist in American society. Individuals act on their prejudices about people who are culturally distinct from themselves; this covers nonracial differences like religion, dress, and other practices that are not biologically determined.

Although a range of irrational hostilities exists among our people, this is not a racist society. Individual liberty and limited government have not solved every problem, but the

---

[29]*Bradwell v. Illinois*, 83 U.S. 130, 140 (1872).

[30] *See Reed v. Reed*, 404 U.S. 71 (1971); *Craig v. Boren*, 429 U.S. 190 (1976); *Stanton v. Stanton*, 421 U.S. 7 (1975); *Caben v. Mohammed*, 441 U.S. 380 (1979). *See also Kalanke v. Bremen*, Case C-450/93, 1996 All ER (EC) 66, [1996] 1 CMLR 175 (1996); *but cf. Marschall v. Land Nordrhein-Westfalen*, Case C-409/95 (E.C.J., opinion November 11, 1997).

[31]*See* Letter from Gordon J. Linton, Federal Transit Administration, U.S. Dep't of Transp., to Robert G. Maclennan, Gen. Manager, Metropolitan Transit Auth. (Apr. 26, 1996)(Exhibit B to Mar. 26, 1997, Houston Contractor's Resp. to Mot. to Modify Prelim. Inj.)

visions of society that compete with it are abysmal failures at liberty, community, and justice. The problem is not whether the government is historically blameless; the question is whether it is now meeting its responsibilities under the Constitution. Posturing about historic wrongs as a cloak for new arbitrary power does not do justice. The solution to racism is not more racism.

In a variety of times and places, the groups in the Metro plan were historical victims of racial, sexual, and ethnic discrimination; none has been legally or customarily discriminated against by Metro. Institutionally Metro has no history of discrimination. There are, of course, odd individual instances of a personal failure among its employees.

19.    *Race Is Not the Answer.*

Metro's use of ethnic criteria violates the Constitution. It says that there is a theory that excuses its discriminatory preferences. It says that minority subcontractors are not participating in construction as frequently as their numbers in the community. It says it may correct this racist imbalance. The obvious flaws in that formula are: it assumes that participation should equal population, and it assumes that the nonparticipation is a consequence of either its racism or independent communal racism. This theory of compensatory racism violates the Constitution. Even if that theory were constitutionally acceptable, Metro does not qualify.

If a government is confronted with active discrimination, Metro says that it should not passively support that system through its purchases. Metro does not suggest that the economy of Houston remains actively segregated; the best it can say is that many of the inequalities found among its citizens probably have some relation to discrimination against them or their ancestors—not necessarily in Houston.

20.    *The Study.*

To establish that it faces a racist condition and that its program addresses the specifics of a particular injury, Metro adopted the study that the City of Houston had done to justify its system of contracting preferences. The report is a recitation of historic injustices in Texas and Houston. It catalogs the segregation of the races by law in nearly every aspect of society. None of that has been doubted. Many of our social problems today

are directly attributable to the effectiveness of historical racial segregation in crippling blacks politically and economically.

Beyond a list of the wrongs of the past, the study does not address anything the city has done lately to mistreat people based on their race. Although there may well be vestiges of segregation in the city administration, the study identifies none. The study uses the familiar aggregate figures on income disparity between groups. Again, nothing in the study connects the city's contracting policies to minority impoverishment. The study fails to note that the whole South still suffers from disparate impoverishment because of its self-inflicted wound of racial segregation.

An indication of the intellectual depth of the report is that it quotes Judge Roy Bean as having said that "there was no law against killing a Chinaman."[32]  Now, as he has come down to us in history, Roy Bean was a scoundrel, but he was a nineteenth century scoundrel about 400 miles from Houston, making him unsuitable as an example of Houstonians in the 1990s.[33]  This bit of folklore about hostility to Chinese-Americans is contradicted by the success of Asian-Americans in Houston.[34]  The Houston Independent School District used to include Asians with non-Hispanic whites for some of its purposes.[35]

The report concludes that small and minority businesses are at a disadvantage when contracting with the City of Houston for these reasons:

- "Exclusion due to the office culture and bureaucratic rules."

- "Economic exclusion by slow payment."

- "Exclusion by City through the setting of high insurance and performance bond rates."

- "Exclusion from getting the specifications or blueprints for a job."

---

[32]City of Houston Disparate Study II-19 (1995).

[33] 1 NEW HANDBOOK OF TEXAS 437-38 (1997).

[34]KLINEBERG.

[35]Roe v. Houston Indep. Sch. Dist., C.A. H-97-1331 (S.D. Tex.).

Page 15.

- "Exclusion from small jobs by City Purchasing office's capricious or irresponsible behavior."[36]

None of these has anything to do with hostility based on race, sex, or ethnicity.

21.    *The Expert.*

Metro hired an expert witness to justify its contracting preferences. David S. Evans illustrates the *Daubert* dilemma. Evans knows statistics, and he has access to complex, voluminous data. The result is not acceptably cogent or substantive.

He uses the ratio of private discrimination lawsuits to total lawsuits and the ratio of unskilled black wages to unskilled white wages to establish that the correlation between low rates of black self-employment is caused by discrimination. He may have found a correlation, but he does not explain the causal connection between low unskilled wages and low self-employment, much less does he connect either with active discrimination in contracting.

As he does later with his interview data, Evans assumes that a person who feels himself aggrieved has a good basis for that suit in fact and law. He has no economic control on the discrimination lawsuits to eliminate the effects of large layoffs in particular industries or regions. "One possible explanation" for lower self-employment is discrimination.[37]

He concludes that the disparity between expected rates of self-employment in construction, purchasing, and services varies a lot, with Houston and Texas doing better on some measures and worse on others.[38]

Echoing the Houston study, he says:

> Our results showed that the cost of completing bids, the ability (or lack thereof) to obtain working capital, length of notification of bid deadlines, large project size and bonding requirements are the most serious bid impediments for M/WBEs.[39]

---

[36]City of Houston Disparate Study II-35 (1995).

[37]Report of David S. Evans, Senior Vice President, National Economic Research Associates, Cambridge, Massachusetts 14 (June 7, 1996).

[38]*Id.* at 19.

[39]*Id.* at 26.

Page 16.

In addition to his econometrics, Evans speculates about the scope of bid solicitation and consequently of the relevant market of contractors. Were he to subscribe to one of the bid services like real contractors do, he would know about the secondary market for bid information.[40]

Also, the use of aggregate statistics do not show the variation within the groups, with there being as much variation with a group as between groups. Aggregate education statistics do not reflect variation in the particular quality or relevance (a point conceded by Evans) of the education; for construction jobs, a contractor with a degree in engineering might have a material advantage over a contractor with a degree in French.

22.    *Percentages.*

Metro prescribes quotas for minority participation in its contracts. Goals in precise numbers often have been used by courts when they are *dis*-establishing things like segregated schools. Because the starting condition is complete segregation, a court needs a temporary indication of the district's movement toward compliance. Because of housing patterns and school locations, it was sometimes better to shift students by bus to achieve integration than to force new construction.[41] These were temporary techniques to eliminate government-imposed race restrictions.

The variety of trolley and bus systems that have served Houston for the last 150 years have reflected their environment, including racially segregating jobs and riders. The City of Houston has engaged in racially-specific statutory discrimination, but that largely ended by 1978. Although many of the laws dealt with matters rather than racial bans on contracting, the legal exclusions in the background areas had the intended effect of severely restricting all economic opportunities for blacks.

Metro was not created until 1978. Metro has never had white-only contracting. It has never segregated its riders or workers. Percentages of participation as an index of the elimination of formal barriers are categorically distinct from using them to compel racial inclusion. This is a shift from percentages as an index of desegregation to a standard of resegregation.

---

[40]Evans at 41.

[41]*Swann v. Charlotte -Mecklenberg Bd. of Educ.*, 402 U.S. 1 (1971).

23.    *Legitimate Ends.*

The legitimate end of Metro is to furnish transportation to the Houston metropolitan area. Its direct programs include a bus system, park-and-ride terminals, high-occupancy-vehicle lanes within freeways, and construction assistance to its constituent municipalities for bridges and roads.

In performing its institutional function as a transportation agency, Metro has adopted a social program collateral to public transportation. This official solicitude for disadvantaged businesses is secondary to its transportation mission.

Metro says that its concern for increased participation is a legitimate function within its governmental authority. It claims that it is (a) correcting the results of historic discrimination by others, (b) lowering its costs by increasing the pool of subcontractors who bid to its prime contractors, and (c) carrying out its obligations to its superiors.

A.    *Historical Wrongs.*

While the state of Texas possesses the residual authority to adopt programs that address social ills, the state has never confided that authority to Metro, except in the narrow instance of purchasing.[42] Although it might be legitimate for Texas to adopt a program aimed at curing the persistent effects of its own historical discrimination, that is not part of the power allocated to Metro.

Since Metro did not participate in the traditional discrimination of Texas's laws, it is not correcting its own wrongs. Even the Texas statute that requires an evaluation of "minority" participation does not limit itself to the actual classes against which Texas traditionally acted. Texas has no history of discriminating legally or socially against Alaska natives, who are included in its statute. Texas obviously copied whatever the federal government required to get federal funds without a determination of the reality of the categories or the applicability to Texas's experience.

B.    *Lower Costs.*

Metro correctly says that, if all artificial and irrational barriers to full participation in the economy were eliminated, (a) the number of people bidding on

---

[42]*See* TEX. TRANS. CODE § 451.251 (1996).

subcontracts would increase and (b) that increase would produce lower costs. The lower costs would come through competition itself and through attracting the best qualified people in the whole community for a particular job. The end of furnishing services to the public through low cost and high quality subcontractors is legitimate as long as the *technique* used is not otherwise prohibited. Racial allocation of contracts does not increase competition; it adds a new artificial barrier to the forces of freedom and efficiency.

## C.    *Obeying Orders.*

Metro says that it is only doing what its funding sources require, especially the federal Department of Transportation. Having a contract or political relation that obliges Metro to violate the Constitution is no excuse. If it needs to violate the Constitution to get funds from a third party, Metro must do without. Metro is responsible for Metro, whether its wrong ideas came from federal bureaucrats or from watching too much television.

Neither the federal nor state statute clearly requires the program as Metro apparently administers it. Under Texas law, Metro is required to award contracts based on competitive bidding.[43] If Metro is right about what the federal regulations require, it still has an independent obligation to comply with the Constitution. Metro's officers are required by the United States Constitution to take an oath to support it; their duty is first to the Constitution, not to Metro or, much less, to its program.[44]

## 24.    *Social Justice, Blocs, and Individuals.*

Because members of these designated disadvantaged groups are more likely than the average person to suffer disadvantages that resulted from historical and social hostility, Metro concludes that it may discriminate in their favor. It may not.

A government may compensate an individual against whom it has discriminated by making an award from the general resources of the community it serves. If a contractor has

---

[43]TEX. TRANS. CODE § 451.110 (1996).

[44]U. S. CONST. art. VI, ¶ 3.

program that discriminates on the basis of race or sex. Among the legitimate governmental interests, administrative convenience is the least compelling.[50]

B.     *Lost Contracts.*

The contractors have earned a judgment based on actual economic injuries caused by Metro's program. At least two non-qualifying subcontractors lost subcontracts to DBEs so that the prime contractor could meet Metro's quota, and at least one contractor lost a Metro contract for failure to meet the DBE quota. The contractors have been awarded some prime contracts but have been denied specific portions of those contracts, have lost a portion of their profits to DBEs, and have incurred additional costs by being required to hire DBEs to do subcontract work that they wanted to perform themselves, reducing the economic benefit of the contract to them.

27.     *The Whole Constitution.*

The Constitution has several provisions other than the requirement of equal protection that prohibit a racial preference in government contracting. Of course, many of them were unenforced against segregation, but the text survived the great reaction[51] and fed the second reconstruction.[52]

A.     *Collective & Inter-Generational Guilt.*

The Constitution disallows collective guilt. A person cannot be held responsible for an act unless he did it. We do not accept the concept that a person is responsible for what others of her race, town, profession, or politics may have done. Not only must she have done the wrong, it must have been a defined wrong before she did it.[53] The Constitution also forbids punishment of the next generation for the wrongs of the last one. This was called corruption of the blood in the

---

[50]*See City of Richmond v. J.A. Croson Co.,* 488 U.S. 469 (1989).

[51]*Plessy,* 163 U.S. 537.

[52]*Brown v. Board of Educ.,* 347 U.S. 483 (1954).

[53]U.S. CONST. art. I, § 9, amend. V, VI, VII.

eighteenth century. Even for the worst crimes, the wrong of the father may not be visited on the son.[54]

B.   *Takings.*

The Constitution forbids the government from solving community problems by taking the property of an individual unless it pays for the property. This forces the community to pay for its own programs. This is a particular instance of the requirement of generality; the Founders knew that their successors would be tempted to profit their allies by imposing on a few, so they reinforced the general prohibition with a specific one against uncompensated takings.[55] In the nineteenth century, taxing blacks to support education that they were denied was argued as a violation of the takings clause.[56] The limit on direct taxation is similar.

Societal needs are to be met from societal resources.

28.   *Formal Equality.*

Advocates of group preferences denigrate the constitutional standard as mere formal equality. This technical equality–purely legal equality–is what the Constitution requires from the government. In our nation's experience the actual achievement of formal equality has been weak and incomplete, and if we substitute a vision of particular equality we will destroy the slow, uneven progress toward true, full legal equality.

29.   *New Program.*

Metro has adopted a new plan that attempts to assist small businesses in contracting with Metro. The apparent abandonment of the racial "set aside" program does not make this case academic. Adopting a plan is a moderately casual piece of business for Metro; it can abandon the race-neutral small business plan in favor of another race-based one through the expenditure of a little time and paper. The new small business plan must be revised to comply with the constitutional requirement of racial and sexual neutrality.

The contractors have not attacked Metro's authority to support small businesses.

---

[54]U.S. CONST. art. III, § 3, ¶ 2.

[55]U.S. CONST. amend. V.

[56]MALTZ at 109.

30.    *Prohibition.*

The Metropolitan Transit Authority of Harris County may not (a) accept data about the race, religion, sex, or national origin of its contractors, subcontractors, suppliers, and services–even if the contractors volunteer the information–until a project has been completed, nor (b) require directly or indirectly the evaluation of a bid or its contractor on grounds of race, ethnicity, and sex, nor (c) base its selection of contractors, services, or purchases on criteria related to race, ethnicity, or sex.  Metro may adopt an individual compensatory contract on the basis of race, ethnicity, or sex when it has  identified a particular business and a particular injury that it received from Metro.[57]

31.    *Conclusion.*

We have been through this before from the opposite direction with Chinese Americans.  In 1880, California's Constitution forbade California corporations from employing Chinese.  That violated the American Constitution.[58]  The result could have been no different if the California Constitution compelled the state's corporations to hire 21% Chinese.  In 1886, the Constitution kept San Francisco from using its supervisors' "discretion" to deny building permits to Chinese-Americans.[59]  It took another sixty years to get the principle right with blacks.

All Americans have as part of their heritage the unjust treatment of Americans who happened to be women, black, Chinese, or Japanese.  Worse, this mistreatment was through the law and with supine accommodation of the courts.[60]   These wrongs of racial classification by the government have consequences that are part of our social fabric today, but they cannot be the constitutional predicate for more racial classifications.

The sole legitimate connection between the minority subcontracts and transportation is Metro's judgment that–in the aggregate and on the average–these groups still suffer disadvantages in life from historical injustices.  The premise is true, but the conclusion is

---

[57]See *Adarand Constr., Inc. v. Pena*, 515 U.S. 200 (1995), *Fullilove v. Klutznick*, 448 U.S. 2100 (1980) (discussing congressional power over interstate commerce).

[58]*In re Parrott*, 1 F. 481 (C.C.D. Cal. 1880)(voiding CAL. CONST. art. XIX).

[59]*Yick Wo v. Hopkins*, 118 U.S. 356 (1886).

[60]*Bradwell*, 83 U.S. 130; *Plessy*, 163 U.S. 537; *Wong Him v. Callahan*, 119 F. 381 (C.C.N.D. Cal. 1902); *Korematsu v. United States*, 323 U.S. 214 (1944).

wrong. To correct an injury to a historic black by a historic white, the program allows Metro to take current opportunities from a non-offending white and allocate them to an uninjured black. Metro cannot rely on the racial and sexual identity of the owners and managers of companies to allow them to participate in its contracts. Ancestors, birthplaces, skin color, and $x$ chromosomes are not components of sound engineering or management.

Eliminating artificial restrictions on roles for women and blacks has liberated both women and blacks, men and whites. Our discovery that cherished traditions about suitabilities differing by race and sex were dead wrong allowed us to rise above forced community and honor the individual at law.

The Constitution limits few choices of policy, but it emphatically limits the way government can go about achieving its policies. Government can address poverty, illiteracy, economic growth, income disparity, and other components of social injustice, but it must use techniques that are neutral and general. In 1909, Senator John Foraker of Ohio tried to correct a racial injustice by the army in Texas. He spoke for the true spirit of the Constitution when he said, "They ask no favors because they are Negroes, but only for justice because they are men." [61]

Signed November 13, 1997, at Houston, Texas.

_____

Lynn N. Hughes
United States District Judge

---

[61] 43 Cong. Rec., 4709-23 (1909), *quoted in* JOHN D. WEAVER, THE SENATOR AND THE SHARECROPPER'S SON: EXONERATION OF THE BROWNSVILLE SOLDIERS 132 (1997).

CMPDF - www.fasoo.com

eighteenth century. Even for the worst crimes, the wrong of the father may not be visited on the son.[54]

B.      *Takings.*

The Constitution forbids the government from solving community problems by taking the property of an individual unless it pays for the property. This forces the community to pay for its own programs. This is a particular instance of the requirement of generality; the Founders knew that their successors would be tempted to profit their allies by imposing on a few, so they reinforced the general prohibition with a specific one against uncompensated takings.[55] In the nineteenth century, taxing blacks to support education that they were denied was argued as a violation of the takings clause.[56] The limit on direct taxation is similar.

Societal needs are to be met from societal resources.

28.      *Formal Equality.*

Advocates of group preferences denigrate the constitutional standard as mere formal equality. This technical equality–purely legal equality–is what the Constitution requires from the government. In our nation's experience the actual achievement of formal equality has been weak and incomplete, and if we substitute a vision of particular equality we will destroy the slow, uneven progress toward true, full legal equality.

29.      *New Program.*

Metro has adopted a new plan that attempts to assist small businesses in contracting with Metro. The apparent abandonment of the racial "set aside" program does not make this case academic. Adopting a plan is a moderately casual piece of business for Metro; it can abandon the race-neutral small business plan in favor of another race-based one through the expenditure of a little time and paper. The new small business plan must be revised to comply with the constitutional requirement of racial and sexual neutrality.

The contractors have not attacked Metro's authority to support small businesses.

---

[54]U.S. CONST. art. III, § 3, ¶ 2.

[55]U.S. CONST. amend. V.

[56]MALTZ at 109.

CMPDF - www.fastio.com

30. *Prohibition.*

The Metropolitan Transit Authority of Harris County may not (a) accept data about the race, religion, sex, or national origin of its contractors, subcontractors, suppliers, and services–even if the contractors volunteer the information–until a project has been completed, nor (b) require directly or indirectly the evaluation of a bid or its contractor on grounds of race, ethnicity, and sex, nor (c) base its selection of contractors, services, or purchases on criteria related to race, ethnicity, or sex. Metro may adopt an individual compensatory contract on the basis of race, ethnicity, or sex when it has identified a particular business and a particular injury that it received from Metro.[57]

31. *Conclusion.*

We have been through this before from the opposite direction with Chinese Americans. In 1880, California's Constitution forbade California corporations from employing Chinese. That violated the American Constitution.[58] The result could have been no different if the California Constitution compelled the state's corporations to hire 21% Chinese. In 1886, the Constitution kept San Francisco from using its supervisors' "discretion" to deny building permits to Chinese-Americans.[59] It took another sixty years to get the principle right with blacks.

All Americans have as part of their heritage the unjust treatment of Americans who happened to be women, black, Chinese, or Japanese. Worse, this mistreatment was through the law and with supine accommodation of the courts.[60] These wrongs of racial classification by the government have consequences that are part of our social fabric today, but they cannot be the constitutional predicate for more racial classifications.

The sole legitimate connection between the minority subcontracts and transportation is Metro's judgment that–in the aggregate and on the average–these groups still suffer disadvantages in life from historical injustices. The premise is true, but the conclusion is

---

[57]See *Adarand Constr., Inc.* v. *Pena,* 515 U.S. 200 (1995), *Fullilove v. Klutznick,* 448 U.S. 2100 (1980) (discussing congressional power over interstate commerce).

[58]*In re Parrott,* 1 F. 481 (C.C.D. Cal. 1880)(voiding CAL. CONST. art. XIX).

[59]*Yick Wo v. Hopkins,* 118 U.S. 356 (1886).

[60]*Bradwell,* 83 U.S. 130; *Plessy,* 163 U.S. 537; *Wong Him v. Callahan,* 119 F. 381 (C.C.N.D. Cal. 1902); *Korematsu v. United States,* 323 U.S. 214 (1944).

CHMPDF - www.fasoo.com

wrong.  To correct an injury to a historic black by a historic white, the program allows Metro to take current opportunities from a non-offending white and allocate them to an uninjured black.  Metro cannot rely on the racial and sexual identity of the owners and managers of companies to allow them to participate in its contracts.  Ancestors, birthplaces, skin color, and $x$ chromosomes are not components of sound engineering or management.

Eliminating artificial restrictions on roles for women and blacks has liberated both women and blacks, men and whites.  Our discovery that cherished traditions about suitabilities differing by race and sex were dead wrong allowed us to rise above forced community and honor the individual at law.

The Constitution limits few choices of policy, but it emphatically limits the way government can go about achieving its policies.  Government can address poverty, illiteracy, economic growth, income disparity, and other components of social injustice, but it must use techniques that are neutral and general.  In 1909, Senator John Foraker of Ohio  tried to correct a racial injustice by the army in Texas.  He spoke for the true spirit of the Constitution when he said, "They ask no favors because they are Negroes, but only for justice because they are men." [61]

Signed November 13, 1997, at Houston, Texas.

Lynn N. Hughes
United States District Judge

---

[61]43 Cong. Rec., 4709-23 (1909), *quoted in* JOHN D. WEAVER, THE SENATOR AND THE SHARECROPPER'S SON: EXONERATION OF THE BROWNSVILLE SOLDIERS 132 (1997).

- 26 -